**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRANDEN PETE,
*Defendant-Appellant.*

No. 14-10370

D.C. No.
3:03-cr-00355-SMM-4

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted
September 18, 2015—San Francisco, California

Filed April 11, 2016

Before: William A. Fletcher, Marsha S. Berzon,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

---

### Criminal Law

The panel vacated a sentence, which the district court imposed on resentencing in light of *Miller v. Alabama*, 132 S. Ct. 2455 (2012), and remanded for appointment of a neuropsychological expert and for resentencing after considering any expert evidence offered.

The defendant was 16 years old when, in 2002, he committed a crime that resulted in a mandatory life sentence without the possibility of parole. Following *Miller*, which held unconstitutional for juvenile offenders mandatory terms of life imprisonment without the possibility of parole, the district court resentenced the defendant to 708 months.

The panel held that the district court abused its discretion in denying the indigent-defendant's motion for appointment of a neuropsychological expert under 18 U.S.C. § 3006A(e) to help develop mitigating evidence at resentencing, where (1) a reasonable attorney would have considered an up-to-date neuropsychological evaluation necessary had the defendant been a nonindigent defendant; and (2) the defendant was prejudiced because a current evaluation could have provided mitigating evidence in support of a lesser sentence.

The panel rejected the defendant's contention that in light of 28 U.S.C. § 994(b)(1), which delegates authority to the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Sentencing Commission to develop sentencing "ranges," the Commission lacked authority to enact base offense level 43, which provides no sentencing "range." The panel explained that at least where, as in 18 U.S.C. § 1111, a single sentence is compelled by statute, a sentencing "range" is properly limited to that sentence. The panel concluded that the district court did not commit prejudicial error when it considered the presentence report's calculation of criminal history points attributable to the defendant's juvenile offenses.

## COUNSEL

Atmore L. Baggot (argued), Apache Junction, Arizona, for Defendant-Appellant.

John S. Leonardo, United States Attorney, District of Arizona; Krissa M. Lanham, Deputy Appellate Chief; Joan G. Ruffennach, Assistant United States Attorney (argued), Phoenix-Arizona, for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

Branden Pete was 16 years old when he committed a crime that resulted in a mandatory sentence of life without the possibility of parole. Later, *Miller v. Alabama*, 132 S. Ct. 2455 (2012), held unconstitutional for juvenile offenders mandatory terms of life imprisonment without the possibility of parole. On resentencing, the district court refused to appoint a neuropsychological expert pursuant to 18 U.S.C. § 3006A(e) to help Pete develop mitigating evidence.

Our principal question on appeal is whether the district court abused its discretion in declining to appoint such an expert to aid the defense. We conclude that it did, and so remand for appointment of an expert, and for resentencing after considering any expert evidence offered. We also consider, and reject, Pete's other challenges to his resentencing.

I.

A.  The Crime

In May 2002, Pete, a Navajo youth who lived on an Arizona reservation, was riding in a car with three men, Hoskie James, Harris James (Hoskie's son[1]), and Irvin Cepi. At the time, Pete was 16 years old, Hoskie was 41, Harris was 20, and Cepi was 23. Hoskie drove the car. Pete and Harris had been drinking for some time before meeting up with Cepi and Hoskie, and the four riders continued to drink while driving.

Hoskie pulled over to pick up a hitchhiker, Charlotte Brown. After a period of driving, Hoskie stopped the car in a wooded area and everyone got out. One member of the group suggested that they rape Brown. They then took turns holding her down and raping her.

After the rapes, everyone got back in the car. The victim sat between Pete and Cepi in the back seat, naked, while Hoskie drove away. Although the exact events and chronology are unclear, it appears that either Brown

---

[1] Because Harris and Hoskie James share a surname, we refer to them by their first names.

threatened to call the police, or the group became concerned that she would. As a result, some member of the group—probably Cepi—suggested killing her.

Hoskie stopped the car once again, and the victim was either ordered or dragged out of the car. She was then physically forced or ordered to the ground. Pete and Harris held Brown down while Cepi, who had retrieved a large rock, threw it onto her head. Brown's face was bleeding, but she continued to breathe, making "stuffy nose" sounds. Pete then threw another rock at Brown's head or face, apparently killing her. Pete asked Harris to "throw [a rock] on her," but Harris said no.

Pete and Cepi then dragged Brown's body into a ditch and covered it with rocks. The perpetrators returned to the car and drove home. Later, to conceal the crime, Harris and Pete set fire to Brown's clothes and shoes and to their own clothing as well.

B. Pre-Trial Events

After Brown's remains were discovered, Pete was arrested. He was held in Navajo tribal custody until a juvenile information was filed in the U.S. District Court for the District of Arizona. *United States v. Brandon P.*, 387 F.3d 969, 971 (9th Cir. 2004).[2] The United States petitioned to try Pete as an adult, invoking the transfer

---

[2] Although the record indicates that Pete spells his first name "Branden," his name was spelled "Brandon" in the case name of earlier iterations of this case.

provisions of 18 U.S.C. § 5032.**³**  *Id.*  In preparation for the
transfer proceedings, the court granted Pete's request under
section 3006A(e) for a forensic psychiatric evaluation.

The forensic evaluator, Dr. Herschel D. Rosenzweig,
interviewed Pete for three hours in May 2003 and reviewed
a number of case-related materials.  Dr. Rosenzweig
described Pete as "cordial, polite and cooperative throughout
the interview," and as "wholly responsive to all inquiries to
the best of his ability."  Pete had "fair vocabulary and [a]
relatively poor fund of general information."  Pete's "first
language is Navajo" and he "had a long history of learning
difficulties, [attending] special education programs while in
school."  Pete dropped out of school at the age of 13, in
seventh grade, when his "level of learning in school was two
to three years delayed."

Pete's "mother and father were severe alcoholics and
drank most of the time."  At the age of 14, Pete began to
drink alcohol more regularly than he had before (he didn't
remember when he first used alcohol) and began using
marijuana; at 15, he started using cocaine.  Pete believed he
was "quite dependent and addicted to alcohol, and []

---

**³** Section 5032 provides, in relevant part:

> A juvenile alleged to have committed an act of juvenile
> delinquency . . . shall not be proceeded against in any
> court of the United States unless the Attorney General,
> after investigation, certifies to the appropriate district
> court of the United States that . . . the offense charged
> is a crime of violence that is a felony . . . , and that
> there is a substantial Federal interest in the case or the
> offense to warrant the exercise of Federal jurisdiction.

acknowledged that [he] ha[d] a serious problem with this substance."

After dropping out of school, Pete lived with various family members. He worked odd jobs, mostly to earn money to buy alcohol and marijuana. Pete described getting into trouble when he used alcohol, but said he didn't drink while living with his older brother in New Mexico. While living with that brother, Pete studied for his GED and intended to complete the exam, but his mother urged him to come live with her, back in Arizona, and he did. Pete's father, who physically abused both Pete and Pete's mother, died shortly before Pete committed the crimes underlying this appeal.

Pete, Dr. Rosenzweig concluded, was a substance abuser who "had virtually no support or help from his family while attending school," and who, "with the exception of one older brother . . . , d[id] not identify any positive role models within his family system." He "appear[ed] to be a youngster who c[ould] be readily intimidated, and influenced by others such that he has little resilience against participating in drug and alcohol abuse when in the company of those who are so inclined." "[B]ut when provided with [positive role] models, he appears to be capable of responding in a very appropriate manner." The doctor noted that Pete was a model prisoner in his ten months at the juvenile facility. According to staff, he had been "an extremely cooperative inmate, had no incidents or inappropriate behavior," and was "polite and cooperative," "essentially . . . a model inmate," attaining the top of five privilege levels in his time there.

Dr. Rosenzweig opined, ultimately, that Pete was "a very salvageable young man, and with adequate structure and support, appropriate treatment resources and abstinence from

substance abuse, he ha[d] the potential of becoming a responsible and productive citizen."

The district court considered Dr. Rosenzweig's evaluation but rejected the doctor's ultimate conclusions, on the ground that the doctor's opinion was influenced by Pete's inconsistent recitation of the crime and events leading to it. The court then granted the United States' motion to transfer the case to try Pete as an adult. *Brandon P.*, 387 F.3d at 971. We affirmed the transfer. *Id.* at 978.

C. Convictions and Initial Sentencing

Pete's trial began in October 2005. Harris pled guilty and testified at Pete's trial.**[4]** *United States v. Pete*, 277 F. App'x 730, 733 (9th Cir. 2008). The jury convicted Pete on counts of second-degree and felony murder, as well as conspiracy to murder. The judge sentenced him to concurrent mandatory terms of life imprisonment without the possibility of parole, pursuant to 18 U.S.C. § 1111.**[5]**

We affirmed the convictions and sentence on all grounds. *See Pete*, 277 F. App'x 730; *United States v. Pete*, 525 F.3d 844 (9th Cir. 2008).

---

**[4]** Cepi was convicted by a jury and sentenced to life imprisonment without the possibility of parole. *See* 18 U.S.C. § 1111.

**[5]** In relevant part, section 1111 provides: "Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life . . . ." 18 U.S.C. § 1111(b). Pete's felony murder convictions were treated as first-degree murder. *See id.* § 1111(a).

D.  Requests for Resentencing and for an Expert

In 2013, after the Supreme Court decided *Miller*, Pete moved for resentencing.  The district court granted the motion, noting that *Miller* requires the court to give a juvenile offender "an opportunity to present mitigating evidence to support a sentence less than life without parole," and ordering that Pete be resentenced on an open record.[6]

Before the resentencing, Pete filed an ex parte motion for expert services pursuant to section 3006A(e),[7] requesting that Marc Walter, Ph.D., be paid to assist him.  Pete explained that Dr. Walter's help was "necessary to pursue information that might mitigate or lessen the sentence imposed on resentencing."  Noting the passage of more than a decade since preparation of the original PSR and Dr. Rosenzweig's forensic evaluation, Pete explained:

> Dr. Walter would conduct a comprehensive
> neuropsychological evaluation which would

---

[6] The United States agreed before the district court that *Miller* applies retroactively and does not contest its retroactivity on appeal.  After this case was argued, the U.S. Supreme Court agreed that the *Miller* rule is retroactive.  *See Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).

[7] Section 3006(A)(e)(1) provides:

> Upon request. –Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.  Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services.

let us know [Pete's] 'mental age', whether he has any cognitive dysfunction which could make him more suggestible or impair his judgment, and whether he has any particular mental disorders which could have played into his behavior.

Further, Dr. Walter "could offer insights into the impact incarceration has had on Mr. Pete, who has been in segregation much of his confinement."

The court denied Pete's motion. It held that although Pete is financially qualified for an expert, he had not shown Dr. Walter's services were "necessary" within the meaning of section 3006A. The court noted that "[t]he purpose of th[e] re-sentencing is to allow defendant Pete to present mitigating evidence in support of a sentence of less than life without parole, in accordance with *Miller* . . . ." Pete's "2003 psychiatric evaluation . . . includes such evidence," said the court, and although Pete "implie[d] that the passage of time may impact that evidence, . . . it is difficult to conceive how . . . . For example, the passage of time would not change his 'family and home environment' nor the 'circumstances of the underlying homicide offense.'" "Not only that," explained the court, "but the 2003 evaluation encompasses the matters which the neuropsychologist intends to evaluate, rendering a second evaluation duplicative." Lastly, "any 'insights into the impact incarceration has had' on [Pete] is not the type of mitigating evidence which *Miller* contemplates."

E.  The Pre-Sentence Report ("PSR")

In preparation for resentencing, the U.S. Probation Office calculated the offense level for Pete's crimes as 43.

Originally, the PSR recommended that three of Pete's juvenile offenses be assigned two criminal history points each. The PSR also discussed Pete's prison record, which included:

> January 25, 2008, possessing intoxicants; January 29, 2008, possessing a dangerous weapon; March 13, 2008, fighting with another person; May 30, 2008, destroying property over $100; October 24, 2008, refusing to take alcohol test and being in an unauthorized area; March 15, 2009, assault without serious injury, wherein the defendant struck with his shoulder a staff member while in restraints; December 8, 2011, possession of a dangerous weapon; April 17, 2012, interfering with security devices, wherein the defendant burned a hole in the exterior window of his cell; April 22, 2012, setting a fire on the SHU range; June 27, 2012, refusing work/program assignment, wherein the defendant refused to accept a cellmate because he was not willing to accept "just any cellie;" October 31, 2013, destroy property $100 or less.

The PSR concluded that the Guidelines range for Pete's crimes was life, and that, pursuant to section 1111, he was subject to two life sentences for the felony murder convictions. The probation officer recommended a life sentence because of "the seriousness of the offense and [to] protect the public from further crimes."

Pete objected to the six criminal history points attributed to three of his juvenile offenses in the PSR. The calculation was incorrect, he contended, because he never served a sentence for those offenses. The probation officer adjusted the calculation to give the offenses one point rather than two, but noted that this did not affect the Guidelines' recommendation of a life sentence.

Pete also challenged the PSR's characterization of his prison record, pointing out that (1) he had explained the circumstances surrounding each infraction; (2) ten "minor incidents in more than seven years is not unusual for an inmate confined prior to age 18, and [is] also not unusual for an inmate who has been transferred between nine different institutions"; and (3) "because these incidents came in spurts over a relatively short period of time, external stressors most likely prompted" them.

F.   Resentencing Proceeding

At resentencing, the court first reviewed the PSR with the parties, asking whether the proper calculation of criminal history points for Pete's juvenile offenses had been resolved. Pete's attorney confirmed, and the United States agreed, that the issue had been resolved.

Pete's counsel, Daniel Drake, then argued. Drake reported that he had met with Pete several times in preparation for resentencing and was struck by his client's inquisitiveness. Pete was "quite unlike" his teenage self, Drake maintained. Pete and Drake had discussed "a number of things, interesting things that, again, belie what [Pete] was like when he was 16." Drake listed Pete's recent reading materials, "including Friedrich Nietzche's[] Beyond Good

and Evil[,] . . . Victor Frankl's[] Man's Search For Meaning, . . . [and] The Alchemist." According to Drake, "[t]hese things intrigue [Pete]. I can't imagine they would have caught his attention at the age of 16." Referring to the comments of a woman with whom Pete had corresponded over the years, Drake summarized, "Mr. Pete is a different person than he was when he committed this offense or when he was sentenced the first time."

Drake then discussed the crime, noting that the jury chose not to convict Pete of first-degree murder. He emphasized that Cepi, not Pete, instigated the crime; that Pete was the youngest participant; and that the car's occupants were drinking heavily. Further, the 2003 evaluation revealed that Pete's cognitive processes as a juvenile mirrored those that concerned the justices and underlay the decisions in *Miller* and *Roper v. Simmons*, 543 U.S. 551 (2005).[8]

Drake then reviewed the 18 U.S.C. § 3553 sentencing factors, explaining, among other things, that, were a life sentence reimposed, Pete would not be allocated the limited rehabilitative services available in prison; that a life sentence was not necessary to protect the public, "given Mr. Pete's growth and maturation"; and that deterrence would not be served by a life sentence because of the nature and extent of crime on the Navajo reservation.

Next, Drake explained that Pete had been in segregation for much of his dozen years in prison and had been transferred many times. His status as a sex offender made him subject to mistreatment by other prisoners. The isolation,

---

[8] *Roper* held unconstitutional capital punishment imposed on individuals who were under 18 at the time of their crimes.

frequent transfer, and mistreatment were relevant to Pete's sentence, according to Drake, in two ways. First, they indicated that Pete would be affected in an excessively negative way by spending a lifetime in prison, nearly always in isolation. Second, Pete's sex offender status explained at least three of his assaultive infractions. Because of his status, other inmates "jumped him," and he had to fight back in self-defense. Also, he had been placed in a cell with another inmate with whom he felt unsafe.

Pete then personally addressed the court. He thanked the court for the opportunity to speak; described prison as a "rough journey" that had taken a mental and emotional toll on him; and explained that because he had spent 80% of his time in solitary confinement, he had done a lot of thinking, with the result that he felt he had "to better [him]self with knowledge, wisdom, understanding, and to . . . have goals . . . ." When the court asked about Pete's work toward his GED, Pete noted that he had studied and taken pretests, but that his solitary confinement prevented him from progressing further.

"[T]he majority of the reason" that he was in solitary confinement, Pete explained, was fear for his life. Being in the "general population . . . , as with my charges, you know, it's political," and the "majority of penitentiary is run by gangs." But he maintained that he had changed quite a bit. He now had "morals, principles, and a code [he goes] by in [his] daily routine, and [he does] his best each and every day to meet those goals." Pete emphasized that he had "changed a lot," "matured" and "grown a lot," that he didn't "have the same mindframe as [he] had as an adolescent, as a youth, at the age of 16," and that he now had goals and wanted to do something positive with his life. Although he wished his

crimes "didn't happen," he couldn't change the fact that they had.

The prosecutor then spoke. Addressing Pete's representation that he had changed, the prosecutor challenged that portrayal: "The defendant says that he has changed, that he has matured. His disciplinary record from the bureau of prisons is at odds with that." The prosecutor noted that Pete was at first housed in the general population but then had to be placed in segregated housing, "because he gets in trouble." Further, Pete had not made much progress toward his GED, having participated in fifteen or twenty classes, and then withdrawing in late 2013, which, the prosecutor suggested, meant Pete was not following through on his asserted goals.

The cruel nature of the crime, the prosecutor continued, justified any deviation between Pete's sentence and those imposed on other juveniles. As an example, the prosecutor referred to Pete's behavior, throwing the rock that probably killed Brown, while Harris refused to participate in stoning Brown. Pete's participation was not due to juvenile impulsivity or poor judgment, discussed in *Miller*, the prosecutor maintained. Overall, said the prosecutor: "I think that that singular act of depravity is just evil. It is not explained by the fact that you were neglected or you drink."

The district court then imposed the sentence. The court reasoned that Pete's prison infractions indicated he had not matured. Next, the court discussed the crime, noting that Pete "was an active knowing and willing participant," that Pete had had time to consider whether he wanted to participate, but that he chose to "deliver[] the fatal blow" and dispose of Brown's body and clothing, and that the crime was "one of the most cruel, deliberate, heinous acts I have seen in over 40

years."    The court also emphasized that Pete had "demonstrated his violence and his antisocial nature while in jail . . . ."  Disagreeing with Dr. Rosenzweig's ultimate prediction about Pete, "particularly when he said . . . he thought there was some opportunities for the defendant to correct himself," the court announced that any sentence less than life would mean that, "upon release . . . , [Pete] still poses a danger, and although they seem to suggest that after the age of 35 people start to diminish their propensity for criminal activity, I am not so sure it is accurate in this case." Although it acknowledged Pete's drinking and family life, the court opined that, "instead of trying to be better than the circumstances of his parents, [Pete] gave into it, and most of the time he spent as a youth was out of school, drinking, doing drugs, and getting into trouble, and there's no indication that that would go unabated."

To calculate the exact sentence, the court reasoned that Pete's life expectancy was 75 years.  It then subtracted Pete's age and the amount of time he had already served to come to a sentence of 708 months—59 years—as the total appropriate sentence, elaborating:

> That means that you have the opportunity to get out of jail, Mr. Pete, when you are 75 years old and live the balance of whatever life you have left back on the reservation.
>
> By that time, the families will be gone.  You will certainly be beyond the age of probably violent behavior.  I doubt that even with that given amount of time you'll be able to do anything productive, but at least it gives you

> a chance to pass on from this life into the next
> outside of the confines of the prison yard.

The court thereupon imposed a 708-month sentence.

## II.

On appeal, Pete first challenges the district court's denial of his motion for an expert under section 3006A(e). "A district court's denial of a request for public funds to hire an expert is reviewed for abuse of discretion." *United States v. Rodriguez-Lara*, 421 F.3d 932, 939 (9th Cir. 2005), *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014).

"The purpose of the Criminal Justice Act [is] to put indigent defendants as nearly as possible in the same position as nonindigent defendants . . . ." *United States v. Sanders*, 459 F.2d 1001, 1002 (9th Cir. 1972). For that reason, under section 3006A(e), "a district judge shall authorize the provision of expert services to a defendant financially unable to obtain them[9] where such services are necessary for adequate representation." *Rodriguez-Lara*, 421 F.3d at 939. A district court thus abuses its discretion in denying an expert "where (1) reasonably competent counsel would have required the assistance of the requested expert for a paying client, and (2) the defendant was prejudiced by the lack of expert assistance." *Id.* at 940 (citation omitted).

Here, both those conditions were satisfied.

---

[9] The parties do not dispute that Pete is financially qualified for an expert.

A.  Necessity

Critical to the question before us is the well-established principle that "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002) (citation omitted).  Further, where, as here, a court is resentencing on an open record, the court is "free to consider any matters relevant to sentencing, even those that may not have been raised at the first sentencing hearing, as if it were sentencing de novo."  *United States v. Matthews*, 278 F.3d 880, 885–86 (9th Cir. 2002) (en banc); *see also Pepper v. United States*, 562 U.S. 476, 490 (2011) ("[A] district court may consider evidence of a defendant's rehabilitation since his prior sentencing.").  Applying those precepts, we have rejected the contention that at resentencing a district court should not consider intervening events, *see United States v. Jones*, 114 F.3d 896, 897–98 (9th Cir. 1997), and have held that a district court should have explained why a PSR was not updated for resentencing, as the earlier PSR did not account for five years during which time the defendant was imprisoned, *see United States v. Turner*, 905 F.2d 300 (9th Cir. 1990).

More specifically on point here is *United States v. Hernandez*, in which the Second Circuit ruled that a district court should have considered changes in the defendant over the course of the 15 years since the original sentence, including how the defendant's aging affected the likelihood of his recidivism; his rehabilitation in the interim; and intervening changes in sentencing law.  *See* 604 F.3d 48, 53–55 (2d Cir. 2010).  We agree with *Hernandez* that at a resentencing, a district court should consider how the passage of time, including the defendant's maturation and personal

development in the interim, affect such sentencing factors as likelihood of rehabilitation and recidivism.

In rejecting the motion to appoint an expert, the district court expressed views inconsistent with that principle. In particular, the district court noted that Pete's upbringing and the circumstances of the crime have not changed, and maintained that because a psychiatric evaluation had been done in 2003, a second evaluation would be "duplicative." "[I]t is difficult to conceive how," the district court stated, "the passage of time may impact [the psychiatric] evidence" presented during the pretrial proceedings nearly ten years before. Further, the district court held that the impact of incarceration on Pete "is not the type of mitigating evidence which *Miller* contemplates." We disagree with the district court as to all three aspects of its reasoning.

First, an evaluation for resentencing would not duplicate the 2003 evaluation. The 2003 evaluation *did* address Pete's family and home environment and the circumstances of the offense, including the extent of his participation and what familial and peer pressures may have played a role. Those section 3553 factors have not changed since Pete committed the offense. But his chronological age has changed. Contrary to the district court's assertion that "it is difficult to conceive how" the passage of time mattered with regard to Pete's family background and the nature of the crime, the passage of time could affect the degree to which Pete was negatively affected by his difficult upbringing, as well as what lessons he had learned, if any, by reflecting on the crime. Indeed, "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Montgomery*, 136 S. Ct. at 734. Moreover, if contemporary factors relating

to psychological maturation and personal evolution were developed, the passage of time could affect the weight given to Pete's family background and the circumstances of the crime in the overall mix of mitigating circumstances.

Second, an individual's psychological makeup could certainly change significantly over a ten-year period, both cognitively and emotionally. Two psychological evaluations ten years apart are simply not "duplicative." *Cf. Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (finding a current psychological evaluation "minimally probative" of a defendant's mental capacity to commit murder eight years earlier); *Eley v. Bagley*, 604 F.3d 958, 967 (6th Cir. 2010) (concluding that psychiatric evaluations performed nearly ten years after a crime had "virtually no probative value" in assessing the defendant's mental state at the time of the crime).

The district court's determination to the contrary was seemingly premised on an erroneously narrow temporal focus—that is, on the assumption that only Pete's mental status at the time of the crime and during the 2003 transfer evaluation is relevant. As we have discussed, however, the resentencing should have taken into account—and, indeed, to some degree did take into account—an assessment of the relevant factors, including the prospects for rehabilitation, as of the time of the resentencing.

Moreover, the likelihood of psychological change over time is very much heightened when, as here, the defendant was a juvenile both at the time of the crime and at the earlier psychological evaluation. As *Miller* observed, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult

minds—for example, in parts of the brain involved in behavior control." 132 S. Ct. at 2464 (citation omitted). The Court in *Miller* also emphasized the specific characteristics of juvenile brain development and resulting mental states that often cause juveniles' impulsivity, recklessness, and vulnerability to outside pressures. *See id.* at 2464–65. As a result of these characteristics, juveniles have less control over their actions, and, critically, greater capacity to change over time so as not to repeat similar behavior, as compared to adults. *Id.* Youth's "signature qualities are all transient," concluded *Miller*. *Id.* at 2467 (citation omitted).

*Miller* also stressed that certain policy rationales underlying hefty punishments—culpability, incapacitation, and rehabilitation—differ as applied to juveniles. *Id.* at 2464–65. "*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 132 S. Ct. at 2465).

To account for the transience of youthful characteristics and the differing policy considerations applicable to minors, *Miller* mandated that a juvenile offender be "provide[d] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 2469 (citation omitted). Accordingly, although *Miller* does "not foreclose a sentencer's ability to [impose life imprisonment] in homicide cases," the case does "require [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

When the district court ruled that no expert testimony was "necessary," it ignored *Miller*'s reasoning and directives. At the time of resentencing, Pete's neuropsychological condition had not been evaluated in more than a decade. An updated evaluation could have revealed whether Pete was the same person psychologically and behaviorally as he was when he was 16. Rather than being "duplicative," as the district court believed, a new evaluation could have shown whether the youthful characteristics that contributed to Pete's crime had dissipated with time, or whether, instead, Pete is the "rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 2469 (citation omitted); *see also Montgomery*, 136 S. Ct. at 733. Similarly, without current information relating to the policy rationales applicable specifically to juvenile offenders, Pete was hamstrung in arguing for a more lenient sentence.

More specifically, the significant mitigating evidence available to Pete at resentencing, other than his own testimony and that of his lawyer (neither of which the district court credited), would have been information about his current mental state—in particular, whether and to what extent he had changed since committing the offenses as a juvenile. This information was directly related to Pete's prospects for rehabilitation, including whether he continued to be a danger to the community, and therefore whether the sentence imposed was "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a); *see id.* (a)(2)(C), (D). Such information is pertinent to determining whether, as *Miller* indicates is often the case, Pete's psychological makeup and prospects for behavior control had improved as he matured, with the consequence that his prospects for rehabilitation and the need for incapacitation had changed.

The third reason the district court gave for rejecting the request for funds to conduct a current psychological evaluation—that the impact of incarceration "is not the type of mitigating evidence [] *Miller* contemplates"—fares no better. As it turned out, the United States, and the district court, emphasized information about Pete's incarceration at the resentencing hearing, relying on the PSR to conclude that Pete's prison record indicated he had not appreciably changed or matured in the twelve years since he committed the offense. Yet, the district court precluded Pete from developing key rebuttal evidence—namely, current evidence as to his mental state. The refusal to authorize expert services thus assured a lopsided presentation of evidence, favoring the United States.

In particular, the court's refusal to approve a new psychological appraisal denied Pete the opportunity to respond effectively to the PSR's discussion of his prison record or to provide corroborating evidence that could substantiate his explanations for his prison infractions. Pete's explanation for his prison record was that his status as a sex offender caused him to be mistreated by other inmates, and therefore resulted in him being placed, indefinitely, in segregated housing. An expert's testimony could have bolstered Pete's arguments that the infractions, which tended to come in spurts over relatively short periods of time, reflected external stressors (such as mistreatment by other inmates), not some inherent and intractable defect in Pete's mature personality. *See Miller*, 132 S. Ct. at 2464 (citing "studies showing that only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior" (citation and internal alterations omitted)); *Montgomery*, 136 S. Ct. at 733, 734. Similarly, the expert could have opined as to the excessively

negative psychological impact that could result from placing Pete in segregated housing for many more years, were his sentence to remain lengthy. In all these respects, an expert could have provided substantive evidence to support the argument that Pete's prison record did not suggest he lacked the capacity for rehabilitation before the age of 75.

To be sure, Pete could have done a better job in his motion for an expert of explaining the ways in which the expert would aid his defense. But Pete did identify the issues he hoped the neuropsychologist would address—mitigating evidence in the form of an analysis of Pete's development and maturity since the offenses, as well as the impact incarceration had had on him.

In sum, the critical question under *Miller* was Pete's capacity to change after he committed the crimes at the age of 16. As to that consideration, whether Pete *has* changed in some fundamental way since that time, and in what respects, is surely key evidence. Under these circumstances, a reasonably competent attorney would have found the services of the requested expert necessary to provide adequate representation at Pete's resentencing. *See* 18 U.S.C. § 3006A(e)(1). By precluding Pete from developing this potential mitigating evidence, the district court abused its discretion.

B. Prejudice

We next consider whether Pete has shown by clear and convincing evidence that the refusal to appoint an expert prejudiced him. *See Rodriguez-Lara*, 421 F.3d at 946.

"[T]he function of the prejudice inquiry is to prevent appellate courts from second-guessing district judges in cases in which the requested services could not have mattered to the outcome." *Id.* at 947. But the inquiry is not meant "to force the defendant to prove that the requested expenditure would *necessarily* have produced a different result." *Id.* The prejudice question is, instead, whether the defendant "requested expert services in furtherance of a *claim* that would, if meritorious, change the outcome of the case." *Id.* (emphasis added). In other words, to show prejudice, the defendant requesting services is not required to proffer what evidence the expert *will* develop—or in this case, the *actual* results of the expert's examination. To so require would be to create a Catch-22, whereby a defendant who cannot afford to pay an expert could obtain an expert's services only by providing precisely the expert evidence he has no funds to pay for. Accordingly, the defendant need only identify the way in which an expert *could* develop evidence in support of a claim that would, if proven, materially benefit the defense. *Id.* at 946–47.

For example, *United States v. Hartfield*, 513 F.2d 254 (9th Cir. 1975), ruled that the defendant was prejudiced by lack of access to an expert whom the defendant requested to examine the defendant's mental status, hoping that the examination would bear fruit as a defense to the crimes charged. Hartfield did not first have to demonstrate what the expert would have concluded. *See id.* at 258; *United States v. Bass*, 477 F.2d 723 (9th Cir. 1973).

Here, the district court's denial of the neuropsychological expert prevented Pete from developing and presenting potentially useful mitigating evidence in line with *Miller*. The expert could have updated the court as to Pete's mental

status, and, depending on his findings, backed up Pete's and his counsel's assertions that Pete (1) had changed positively during his time in prison; (2) was susceptible to rehabilitation; and (3) either no longer presented a danger to the community or likely would not be a danger at some time before he was 75. The expert could also have placed Pete's prison record in context, explaining the impact on Pete of segregated housing and harassment by other prisoners. Particularly because the district court was skeptical, at best, of Pete's and his counsel's representations as to these issues, Dr. Walter's evaluation was likely the only *Miller*-related evidence that could possibly convince the district court that Pete deserved leniency. Because Pete "requested expert services in furtherance of a claim that would, if meritorious, change the outcome of the case," *Rodriguez-Lara*, 421 F.3d at 947, he was prejudiced by not having access to the expert he requested.

In summary, a reasonable attorney would have considered an up-to-date neuropsychological evaluation necessary had Pete been a nonindigent defendant. And because a current evaluation could have provided mitigating evidence in support of a lesser sentence, Pete was sufficiently prejudiced by the failure to appoint a psychological expert before resentencing. We therefore vacate Pete's sentence and remand for resentencing.

III.

Pete next challenges the U.S. Sentencing Commission's authority to enact base offense level 43, which provides no sentencing "range." While 28 U.S.C. § 994(b)(1) delegates authority to the Commission to develop sentencing "ranges," it also requires the Commission to develop Guidelines

consistent with "*all pertinent provisions of title 18, United States Code*." (Emphasis added). Level 43 corresponds to the mandatory minimum sentence of life codified in section 1111, a provision in title 18 with which the Guidelines must be consistent. *See also* U.S.S.G. § 2A1.1 & cmt. n.1 (providing that the base offense level for murder offenses is 43, consistent with and incorporating section 1111). At least where a single sentence is compelled by statute, a sentencing "range" is properly limited to that sentence. We therefore do not decide whether a "range" is more than one suggested sentence where no particular sentence is mandated by statute.

Pete has not shown the district court erred by calculating the Guidelines' recommended base offense level as 43.[10] Notably, after conducting that calculation, the district court did not sentence Pete to the Guidelines life sentence, but instead to 708 months.

IV.

Pete also has not demonstrated that the district court committed prejudicial error when it considered the PSR's calculation of criminal history points attributed to his juvenile offenses. Even assuming that Pete's objection to the district court's calculation of his criminal history category based on his juvenile offenses was forfeited, as opposed to waived, *see United States v. Alferahin*, 433 F.3d 1148, 1154 n.2 (9th Cir. 2006), and assuming the district court committed plain error by attributing criminal history points to three of his juvenile offenses (but not to others that resulted in the same juvenile "sentence"), *id.* at 1154; *see also* Fed. R. Crim. P. 52(b), Pete

---

[10] Pete does not argue that *Miller* compelled the Commission to revise base offense level 43 as it pertains to minors.

has not shown prejudice as a result of the error, *see Alferahin*, 433 F.3d at 1157–58.

The Guidelines recommend life imprisonment for all criminal history categories at base offense level 43. So, even if the district court erroneously calculated the criminal history category, the Guidelines would recommend the same sentence for him. And, because the PSR identified many juvenile offenses for which Pete was not given criminal history points, it is unlikely that eliminating three points for three juvenile offenses would have materially changed the court's overall view of Pete's criminal history, considered apart from the offense level calculation. It is that overall perception, rather than the number of criminal history points, that mattered here, where the criminal history points did not affect the base offense level calculation and the court imposed a non-Guidelines sentence.

## V.

While Pete's latter two challenges fail, we conclude that he was entitled to the assistance of an expert for resentencing. For that reason, we vacate the 708-month sentence and remand, instructing the district court to grant Pete's motion for expert services, and to resentence Pete after having done so.

**SENTENCE VACATED AND REMANDED FOR RESENTENCING.**