**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. RILEY BRIONES, JR., AKA Unknown Spitz, *Defendant-Appellant.* | No. 16-10150 D.C. No. 2:96-cr-00464-DLR-4 OPINION |

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted August 15, 2017
San Francisco, California

Filed May 16, 2018

Before: Diarmuid F. O'Scannlain and Johnnie B.
Rawlinson, Circuit Judges, and David A. Ezra,[*] District
Judge.

Opinion by Judge Rawlinson;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

---

[*] The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a life sentence imposed on a juvenile offender.

The defendant, a juvenile at the time he committed the offenses, was convicted of felony murder and other crimes and was sentenced to life imprisonment without parole on the felony murder count under the then-mandatory United States Sentencing Guidelines. Following *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders), the district court granted the defendant's motion under 28 U.S.C. § 2255 to vacate his original mandatory life sentence. At resentencing, the district court imposed a new life sentence.

The panel held that, at resentencing, the district court did not err by first calculating and using the sentencing guideline range of life imprisonment.

The panel held that under *Miller* and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the district court was required to consider the "hallmark features" of youth before imposing a sentence of life without parole on a juvenile offender. The panel also held that, as part of the district court's inquiry into whether the defendant was a member of the class of permanently incorrigible juvenile offenders, the

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

court had to take into account evidence of the defendant's rehabilitation. Reviewing for plain error and abuse of discretion, the panel held that the district court met these requirements.

Concurring in part and dissenting in part, Judge O'Scannlain agreed with the majority that the defendant was not categorically ineligible for a life sentence simply because he was a juvenile who did not pull the trigger, and that the district court was correct to begin its sentencing process by calculating the Sentencing Guidelines range. Dissenting from Part II.B of the opinion, Judge O'Scannlain disagreed with the majority's holding that the district court sufficiently considered the defendant's claim that he was not in that class of rare juvenile individuals constitutionally eligible for a life-without-parole sentence. Judge O'Scannlain wrote that he would remand for the limited purpose of permitting the district court properly to perform the analysis required by *Miller* and *Montgomery*.

## COUNSEL

Vikki M. Liles (argued), Phoenix, Arizona, for Defendant-Appellant.

Patrick J. Schneider (argued), Assistant United States Attorney; Krissa M. Lanham, Deputy Appellate Chief; Elizabeth A. Strange, First Assistant United States Attorney; United States Attorney's Office, Flagstaff, Arizona; for Plaintiff-Appellee.

**OPINION**

RAWLINSON, Circuit Judge:

We must decide whether the district court appropriately rejected a juvenile offender's argument that he should not receive a sentence of life without parole.

I

A

Riley Briones, Jr. was a founder and leader of a gang styled the "Eastside Crips Rolling 30's." Briones was involved in and helped to plan a series of violent crimes committed by the gang on the Salt River Indian Reservation. As a result of these crimes, on October 23, 1996, Briones and four other members of the gang were indicted on federal charges including felony murder, arson, assault, and witness tampering.

The most serious of the crimes was a murder committed on May 15, 1994, when Briones was seventeen. According to evidence presented at trial, Briones and fellow gang members planned to rob a Subway restaurant knowing that there would be only one employee present. Briones drove four other gang members to the restaurant, including one armed with a gun, and parked his car outside while the other four went in to rob the store. They ordered food from the lone employee, and while it was being prepared, the gunman returned to the car to speak with Briones, then went back into the restaurant, shot the clerk in the face, and then shot him several more times on the floor. With the cash register locked, the gang members were able to steal only a bag with

$100 and the food they had ordered. One of the gang members, who eventually cooperated with the government, testified that after they got back in the car, Briones looked for a maintenance man whom he thought had seen them. According to the cooperating witness, Briones instructed the other gang members to shoot the maintenance man.

Three weeks later, Briones helped plan to firebomb a rival gang member's home and prepared the Molotov cocktails to be used. Although Briones was not the one to throw them, a fellow gang member did, setting fire to a house with a family inside, including an eleven-year-old girl. Fortunately, the child was not harmed. Several months later, the gang decided to try firebombing the same home again. Briones once more provided Molotov cocktails and drove other gang members to a kindergarten and an abandoned trailer house to set diversionary fires. Briones then drove them to the rival gang member's home, which they firebombed. Again, fortunately, the family was unharmed. Another month later, Briones helped plan a drive-by shooting of the same home, although he was neither the driver nor the shooter.

Over the next year, Briones continued to participate in gang-related crimes. He pistol whipped a member of his gang who revealed he knew about the Subway murder. That gang member managed to escape and eventually cooperated with authorities. When other gang members committed another drive-by shooting of a home with a mother and child inside, Briones made sure the culprits disposed of their clothes and accounted for the shell casings. At trial, the government also presented evidence that Briones discussed escaping from custody, that he carved gang graffiti into the door of a jail cell, and that he discussed plans to blow up the

Salt River Police Department and to kill a tribal judge, federal prosecutors, and Salt River Police investigators.

Briones was arrested on December 21, 1995. He was one of five co-defendants, each of whom was made a plea offer of twenty years in prison. Briones declined the offer, in part because his father (one of the co-defendants) would not take the deal. Ultimately, Briones was convicted of all charged offenses. At the original sentencing in July, 1997, Briones continued to deny responsibility for the crimes. As part of its sentencing determination, the district court found that Briones was the leader of the gang, and imposed the then-mandatory guidelines sentence of life imprisonment without parole on the felony murder count. Briones was also sentenced to ten and twenty years, respectively, to run concurrently on the non-homicide counts, which he has since served.

## B

Fifteen years after Briones's original sentencing, the Supreme Court held in *Miller v. Alabama* that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. 460, 479 (2012) (citation omitted). In light of that holding, a sentencing judge is required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at 480 (footnote reference omitted). On the basis of *Miller*, Briones filed a motion under 28 U.S.C. § 2255 to vacate his original mandatory life sentence, which the district court granted in July, 2014.

At his resentencing, Briones requested a sentence of 360 months' imprisonment rather than a life sentence. He

argued that the sentencing guidelines, which recommend a life sentence in his case, should be set aside in light of *Miller*. Invoking the "hallmarks of youth" identified by *Miller*, Briones argued that a life sentence was inappropriate in his case. He argued that his gang participation was a product of youthful immaturity and a desire to have a "feeling of banding together." He pointed to a dysfunctional childhood environment, including parental drug and alcohol abuse, a history of family criminality (both his father and brother were also in the gang and were co-defendants), dropping out of school in the tenth grade, and difficulties as a Native American attending school off the reservation. He said that he was poorly situated to aid in his own defense or to contradict his father when he refused to take a plea deal that would have resulted in a much lower sentence. To mitigate his culpability in the crime, he observed that the robbery scheme was not his idea and that he was not the shooter. Finally, he pointed to evidence of rehabilitation, including that in all his time in prison he had not been written up once for a disciplinary infraction, that he had no gang involvement, that he had been working continuously, and that he married his girlfriend with whom he has a now-adult child, and that he sees his wife regularly.

Both Briones and his wife testified at the resentencing hearing and discussed the difficulties of his childhood. Briones testified that he started drinking around age 12 and as a teenager was regularly drunk in addition to using cocaine and LSD. He wrote a letter to express "[g]rief, regret, sorrow, pain." He stated:

> I don't know how but I know I have to apologize for everything and I apologize all the time to my family because they're there,

and my apology goes out to also to the [victim's] family and to all the families, not just for what happened but for the other changes that occurred in my life.

Although Briones told the court that he "want[ed] to express remorse" and "want[ed] to express grief," he never actually took responsibility for any of the crimes of which he was convicted.[1]

The government countered that Briones deserved a life sentence. The government acknowledged that under *Miller*, "a life sentence for a juvenile is inappropriate in all but the most egregious cases," but argued that "this is the most egregious case." Despite recognizing that Briones was "really doing well in prison," the government noted that Briones expressed remorse, but failed to accept responsibility, and continued to minimize his role in the murder and in the gang. Specifically, the government contended that it was not credible that Briones was unaware of the gang members' intention to murder the Subway clerk, and circumstantial evidence suggested Briones himself may have ordered the murder, because the gunman shot the clerk immediately upon reentering the restaurant after speaking with Briones outside. The prosecutor described Briones's gang as "the most violent gang that I have ever been involved in prosecuting," including the Hells Angels. Finally, the government pointed out that although Briones was a juvenile, he was only barely—he was over seventeen years and eleven months old when the murder occurred—and he continued to commit

---

[1] The dissent's statement that Briones "expressed remorse repeatedly and at length," *Dissenting Opinion*, p. 30, is simply not supported by the record.

violent crimes for another year and a half, stopping only when he was arrested.

After hearing from the parties, and "[u]sing the guidelines as a starting point," the district court calculated a sentencing range of life imprisonment for Briones's felony murder conviction without objection from counsel. The court noted that, "in addition to the presentence report, I've considered the Government's sentencing memorandum, the defendant's sentencing memorandum[,] . . . the transcript of the [original] sentencing[,] . . . the victim questionnaire and the letters on behalf of the defendant." The court found that "[a]ll indications are that defendant was bright and articulate, he has improved himself while he's been in prison, but he was the leader of a gang that terrorized the Salt River Reservation community and surrounding area for several years. The gang was violent and cold-blooded." Briones "appeared to be the pillar of strength for the people involved to make sure they executed the plan [to murder the victim]," and he "was involved in the final decision to kill the young clerk." The court expressed that "in mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and he's been a model inmate up to now. However, some decisions have lifelong consequences."

Ultimately, the district court announced that, "[h]aving considered those things and all the evidence I've heard today and everything I've read . . . it's the judgment of the Court that Riley Briones, Jr. is hereby committed to the Bureau of Prisons for a sentence of life."

Because the federal system does not permit parole or early release from life sentences, *see* 18 U.S.C. § 3624, Briones's sentence is effectively for life without the possibility of parole. *See United States v. Pete*, 819 F.3d 1121, 1126, 1132 (9th Cir. 2016).

Briones timely appealed.

## II

The district court's sentencing decision is reviewed for abuse of discretion, and "only a procedurally erroneous or substantively unreasonable sentence will be set aside." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing *Rita v. United States*, 551 U.S. 338, 341 (2007)). The factual findings underlying the sentence are reviewed for clear error. *United States v. Stoterau*, 524 F.3d 988, 997 (9th Cir. 2008). "When a defendant does not raise an objection to his sentence before the district court, we apply plain error review. . . ." *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009) (citation omitted).

## A

Briones first contends that the district court erred by calculating and using the sentencing guideline range. He argues that, in light of *Miller*, "a court should no longer start with a life sentence and work down, which is precisely what the district court did here." Instead, says Briones, "a court must start from the presumption that a life sentence should be uncommon" so that using the guidelines as "the starting point was error that entitled Mr. Briones to a new sentencing."

As the Supreme Court has repeatedly held, however, "a district court should begin *all* sentencing proceedings by correctly calculating the applicable Guidelines range," and "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (emphasis added) (citing *Rita v. United States*, 551 U.S. 338, 347–48 (2007)). Although "[t]he Guidelines are not the only consideration," and a sentencing court "may not presume that the Guidelines range is reasonable," the district court's "individualized assessment based on the facts presented" must follow a correct guidelines calculation.

Briones can point to no language in *Miller* or subsequent case law that overrules those clear instructions. We therefore see no error in the district court following the sentencing process prescribed by the Supreme Court. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that precedent is controlling unless subsequent authority has "undercut the theory or reasoning underlying the prior . . . precedent in such a way that the cases are clearly irreconcilable.").

B

Briones next argues that the district court erred by failing to "appropriately consider the[] factors" identified in *Miller* for sentencing juvenile offenders. He asserts that the district court "merely recite[d] 'youth' as a mitigating circumstance" when it was in fact required substantively to "consider the mitigating quality of youth." He argues that the court failed to give the evidence of his rehabilitation "the weight *Miller* requires" and instead "focused on the facts of the case." Briones contends that "[t]he critical question should have

been whether Mr. Briones had the capacity to change" and that the district court gave "short shrift" to "the evidence of [his] maturation and change in demeanor." He also points to evidence he presented of his immaturity, dysfunctional family environment, and inability to aid in his own defense, which he says the district court "failed to properly assess" in evaluating "the hallmarks of youth that must be considered before sentencing a juvenile to spend the rest of his life in prison."

In *Miller*, the Supreme Court held unconstitutional mandatory life-without-parole sentences for juvenile offenders and, in so doing, enumerated a series of factors sentencing courts should consider:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with you—for example, his inability to deal with police officers or prosecutors (including on a

plea agreement) or his incapacity to assist his
own attorneys.

567 U.S. at 477–78.

In *Montgomery v. Louisiana*, the Supreme Court
elaborated upon the *Miller* holding to clarify that it "did more
than require a sentencer to consider a juvenile offender's
youth before imposing life without parole; it established that
the penological justifications for life without parole collapse
in light of 'the distinctive attributes of you.'" 136 S. Ct. 718,
734 (2016) (quoting *Miller*, 567 U.S. at 472). Therefore,
"[e]ven if a court considers a child's age before sentencing
him or her to a lifetime in prison, that sentence still violates
the Eighth Amendment for a child whose crime reflects
unfortunate yet transient immaturity." *Id*. (citation and
internal quotation marks omitted). The Court concluded that
"sentencing a child to life without parole is excessive for all
but the rare juvenile offender whose crime reflects
*irreparable corruption*" and that *Miller* "bar[s] life without
parole . . . for all but the rarest of juvenile offenders, those
whose crimes reflect permanent incorrigibility." *Id*. (citation
and internal quotation marks omitted). "*Miller* made clear
that 'appropriate occasions for sentencing juveniles to this
harshest possible penalty will be uncommon.'" *Id*. at 733–34
(quoting *Miller*, 567 U.S. at 479).

In light of *Miller* and *Montgomery*, we agree with Briones
that the district court had to consider the "hallmark features"
of youth before imposing a sentence of life without parole on
a juvenile offender. We also agree that, as part of its inquiry
into whether Briones was a member of the class of
permanently incorrigible juvenile offenders, it had to take

into account evidence of his rehabilitation. However, we disagree that the district court failed to do so.

We resolve these issues through the lenses of plain error and abuse of discretion review—plain error review because Briones failed to object at sentencing, and review for abuse of discretion because of the "significant deference" we afford district courts' sentencing determinations. *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir. 2017) (citation omitted). Nothing in *Miller* or *Montgomery* altered these longstanding principles.

In order for a decision to constitute plain error, the error must be so obvious that a district court judge should be able to avoid the error without the benefit of an objection. *See United States v. Klinger*, 128 F.3d 705, 712 (9th Cir. 1997).

In the sentencing context, a district court judge abuses his discretion "only if the court applied an incorrect legal rule or if the sentence was illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Martinez-Lopez*, 864 F.3d at 1043 (citation omitted). Briones' claim cannot survive this double layer of deferential review.[2]

The gist of Briones's appeal is that the district court failed to make an explicit finding that Briones was "incorrigible," that the district court failed to adequately consider the "hallmarks of youth" discussed in *Miller*, and that the district

---

[2] Our colleague in dissent criticizes the majority for following this rule. *See Dissenting Opinion*, p. 30 (objecting to the reference to reasonable inferences from the record).

court did not adequately consider Briones's rehabilitation. We are not persuaded.

There is no doubt that the "hallmarks of youth," as they related to Briones, were considered by the court because the record is replete with references to those hallmarks, reflected in the following statements from Briones's counsel, and encompassing rehabilitation:

- [If] we look at the *Miller hallmarks of youth*, . . . Briones . . . showed immaturity . . .

- So what we have here is classic immaturity, the feeling of banding together to–with his friends to form a gang is–. . . something that happens to especially young guys when they are 15, 16, 17 years old, and that is a toxic thing when you deal with impetuosity and the failure to appreciate risk and consequences.

  . . .

  This is a *hallmark of youth*, the decision to join a gang, to go along with your buddies . . .

- And what is one of the *hallmarks of* . . . young guys as they start to mature . . . is the finding of your place in the world, and not only that finding, your identity . . . [H]e was already struggling with his

identity as a Native American and how
that fit beautifully on to the reservation
and not so well on to the Mesa school
system.

- And so part of this *hallmark of youth* . . .
is something that either he–was not
explained properly or he didn't understand
it, which indicates that–an inability to deal
with the case.

. . .

So he was making bad choices because he
was a teenager who didn't understand the
risks and consequences of his behavior.

. . .

[F]inally the *Miller hallmark of youth* is
that a mandatory life sentence disregards
the potential for rehabilitation.

. . .

So in a sense prison has been good to
Riley Briones because it has changed him,
allowed him to change himself, but he
does not need to die in prison, Judge. He
has rehabilitated himself.

(Emphases added).

Defense counsel also emphasized to the court that Briones had no write-ups in prison, and had become a family man.

The government acknowledged that Briones was "doing well in prison," but expressed disappointment that Briones had never accepted responsibility. From the government's perspective, Briones minimized both his role in the Subway murder and his role in the gang. The government recounted in detail testimony from co-defendants explaining that Briones was a leader of the gang, and instructed them to find and kill a potential witness to the Subway murder.

The government also pointed out that Briones was only twenty-two days shy of his eighteenth birthday when the Subway murder was committed, that Briones continued his crime spree for another eighteen months, and that Briones scratched gang graffiti into his cell door three years after the Subway murder. According to the government, Briones's actions were "not indicative of an individual who is so immature that he didn't know what he was doing." The government argued that Briones's conduct was not sufficiently mitigating to warrant a change in Briones's sentence.

After hearing from defense counsel and the government, the court demonstrated that it had heard and considered all the information presented and remarks made during the sentencing hearing, stating:

> Well, in mitigation I do consider the history of the abusive father, the defendant's youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular

and constant abuse of alcohol and other drugs,
and he's been a model inmate up to now.[3]

Nevertheless, the judge determined that after considering "all the evidence . . . and everything the judge had read," a life sentence for Briones was warranted.

Admittedly, the district court did not explain at length why consideration of Briones's youth failed to persuade the court to impose a sentence of less than life imprisonment. But he was not required to do so. Nothing in the *Miller* case suggests that the sentencing judge use any particular verbiage or recite any magic phrase. *See Montgomery*, 136 S. Ct. at 735 (noting that *Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility). Rather, in the Supreme Court's own words, the sentencing judge is "require[d] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480. We can rest assured that the district court judge followed this mandate because he said so on the record—that he had considered everything he heard and read in conjunction with the sentencing hearing, including counsel's impassioned arguments regarding how the "hallmarks of

---

[3] These detailed arguments definitely rebut the dissent's "suggestion" that the "district court may have misunderstood the nature of the inquiry Briones was asking it to make." *Dissenting Opinion*, p. 29. Our colleague would have preferred different phrasing from the district court, *see id.*, pp. 29–30, but no such requirement can be gleaned from *Miller* or *Montgomery*.

youth" particular to Briones counseled against imposition of a life sentence.[4]

Fairly read, Briones's statements could reasonably be interpreted as not taking responsibility for his prior criminal activity, in contravention of one of the basic tenets of rehabilitation. *See, e.g.*, *In re Arrotta*, 208 Ariz. 509, 515 (2004) (en banc) ("Accepting responsibility for past misdeeds constitutes an important element of rehabilitation. . . ."). As we explained in *United States v. Carty*, 520 F.3d 984, 995 (9th Cir. 2008) (en banc), when the district court has listened to and considered all the evidence presented, the district court is not required to engage in a soliloquy explaining the sentence imposed.

In *Rita*, 551 U.S. at 358, the Supreme Court, also recognized that brevity does not equal error in the sentencing context. Upholding a sentence against a challenge that the judge's statement of reasons was too brief, the Supreme Court observed:

> In the present case the sentencing judge's statement of reasons was brief but legally sufficient. . . . The record makes clear that the sentencing judge listened to each argument. The judge considered the supporting evidence [and] simply found these circumstances

---

[4] Our colleague in dissent would have the district court expound more on its reasoning, to the extent of remanding for the district court to do so. *See Dissenting Opinion*, pp. 31–32. Tellingly, no case authority is cited to support this proposition. Indeed, *Miller* and *Montgomery* stand for the exact opposite premise. *See Montgomery*, 136 S. Ct. at 735 (noting that *Miller* imposed no factfinding requirement).

insufficient to warrant a [lower sentence]. . . .
He must have believed that there was not
much more to say.

*Id*.

The Supreme Court "acknowledge[d] that the judge might
have said more" but explained that where "the record makes
clear that the sentencing judge considered the evidence and
arguments, we do not believe the law requires the judge to
write more extensively." *Id*. at 359.

Reviewing for plain error, we conclude that the
sentencing remarks in this case fell well within the contours
articulated by the Supreme Court in *Rita*, reflecting the
judge's consideration of and reliance upon the record. *See id*.
at 358–59; *see also United States v. Kleinman*, 880 F.3d
1020, 1041 (9th Cir. 2018), *as amended* ("A sentencing
judges does not abuse its discretion when it listens to the
defendant's arguments and then simply finds the
circumstances insufficient to warrant a [lower sentence]. The
court listened to [defendant's] arguments, stated that it
reviewed the statutory sentencing criteria, and imposed a
within-Guidelines sentence; failure to do more does not
constitute plain error.")[5] (citations and internal quotation
marks omitted).

---

[5] This authority negates the dissent's argument that the sentencing
judge "failed to provide an adequate explanation of its sentence under the
same standard that would apply to any sentencing." *Dissenting Opinion*,
p. 35. Under the applicable standard, the sentencing judge's remarks were
adequate. *See Kleinman*, 880 F.3d at 1041.

On this record, we cannot honestly say that the district court's imposition of a sentence of life imprisonment was "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Martinez-Lopez*, 864 F.3d at 1043 (citation omitted). In other words, no error occurred and without error there can be no plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (explaining that "there must be an error" before plain error review is invoked).

Perhaps the outcome of this appeal would be different if we were reviewing *de novo*. But we are not reviewing *de novo*. We are reviewing through the doubly deferential prisms of abuse of discretion and plain error standards of review.[6] With those standards of review firmly in mind, we conclude that the district court's pronouncement of sentence was adequate.[7] *See Rita*, 551 U.S. at 358; *see also Carty*, 520 F.3d at 995; *Kleinman*, 880 F.3d at 1041.

---

[6] Our colleague in dissent seeks to avoid plain error review despite a clear record showing a lack of objection from Briones in the district court to the asserted lack of an adequate statement of fact of incorrigibility from the sentencing judge. *See Dissenting Opinion*, pp. 33–34 & n.2. We are not persuaded. *See Hammons*, 558 F.3d at 1103 (applying plain error review when no objection was raised).

[7] Our colleague in dissent remarks that "we are ill-suited as an appellate court to say that a finding of incorrigibility is the only reasonable one." *Dissenting Opinion*, p. 33. However, it is not our role to say whether the district court's finding was "the only reasonable one." Rather, our sole role is to determine whether the district court's finding was *a* reasonable one. *See Martinez-Lopez*, 864 F. 3d at 1043 (noting that a district court abuses its discretion if it imposes a sentence that is "illogical" or "implausible.")

Our colleague in dissent relies upon the unpublished disposition of *United States v. Orsinger*, 698 F.App'x 527 (9th Cir. 2017) to support the argument that the district court should have said more. Not only is this case non-precedential and non-binding, it is not even persuasive. In *Orsinger*, we affirmed a sentence for the same reason we should affirm the sentence in this case—because of the deference we afford sentencing courts under the abuse of discretion standard of review. *See id*. at 527 (referencing the judge's choice between "two permissible views of the evidence"); *see also Gall v. United States*, 522 U.S. 38, 51 (2007) (discussing the deference due to a district court's sentencing decision).

Ultimately, the majority is of the view that affirming the sentence imposed by the district court conforms to our precedent and that of the United States Supreme Court. In the cogent words of our esteemed colleague Judge Farris, "[m]y [colleague] and I differ on what is the appropriate appellate function. He would retry. I am content to review." *Li v. Ashcroft*, 378 F.3d 959, 964 n.1 (9th Cir. 2004).

### III

Briones makes two further arguments that he is *categorically* ineligible for a life-without-parole sentence, implying that we should instruct the district court on remand that he may not receive that sentence under any review of the record. First, he argues that a life sentence may not be imposed "on a juvenile offender who did not actually kill," so he may not receive that sentence because he was not the gunman. Second, he argues that the Eighth Amendment prohibits life sentences for juvenile offenders entirely.

Both arguments are foreclosed by *Miller* and *Montgomery*. *Montgomery* specifically observed that "*Miller* . . . did not bar a punishment for all juvenile offenders," and that although life without parole is now limited to "the rare juvenile offender," those rare offenders "can receive that . . . sentence." *Montgomery*, 136 S. Ct. at 734. *Miller* itself involved a defendant who did not fire the bullet that killed" the victim. *Miller*, 567 U.S. at 478. The Supreme Court did not say that he could not be sentenced to life without parole, but only that "a sentencer should look at" mitigating facts of youth "before depriving [the defendant] of any prospect of release from prison." *Id*. Given that *Miller* and *Montgomery* expressly envision that some juveniles may be sentenced to life without parole, including those who did not actually "fire the bullet," the district court could still constitutionally sentence Briones to life in prison.

**AFFIRMED.**

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

As the majority opinion's detailed recitation of the facts makes clear, Riley Briones, Jr., participated in a cold-blooded murder and was a leader in a vicious gang, *see* Majority Op. Part I.A, so it is not difficult to understand why the district court considered a severe sentence appropriate. Notwithstanding the grievous nature of the crimes, however, the court was required to follow the Supreme Court's holding that the Eighth Amendment bars life-without-parole sentences

"for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016) (citing *Miller v. Alabama*, 567 U.S. 460 (2012)).

I agree with the majority that nothing in *Montgomery* or *Miller* indicates that Briones is categorically ineligible for a life sentence simply because he is a juvenile who did not pull the trigger, *see* Majority Op. Part III, and I agree that the district court was correct to begin its sentencing process by calculating the Sentencing Guidelines range, *see id.* Part II.A. I cannot agree, however, with the majority's holding that the district court sufficiently considered Briones's claim that he was not in that class of rare juvenile individuals constitutionally eligible for a life-without-parole sentence. *See id.* Part II.B.

The majority reads too much into the district court's cursory explanation of its sentence, and it divines that the district court must have adopted the rationale for its sentence suggested by the government on appeal.  Although a sentencing court need not pedantically recite every fact and legal conclusion supporting its sentence, it must provide enough explanation for a court of appeals to evaluate whether or not the decision to reject a defendant's argument is consistent with law.  The sparse reasoning of the district court in this case gives me no such assurance.

I respectfully dissent from Part II.B of the opinion and would remand for the limited purpose of permitting the district court properly to perform the analysis required by *Miller* and *Montgomery*.

I

The difficult question raised in this case is whether Briones is in fact one of those "rarest of juvenile offenders . . . whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734. Without any evident ruling on that question, the district court imposed a life sentence on Briones. As the majority indicates, because there is no parole in the federal system, that "sentence is effectively for life without the possibility of parole." Majority Op. at 10.

A

The majority is comfortable deferring to the district court's sentence because the court considered some of the "hallmark features" of youth identified by the Supreme Court in *Miller*. 567 U.S. at 477; *see* Majority Op. at 13–15. I agree that the court did so, which we know because it expressly said it considered "the defendant's youth, immaturity, [and] his adolescent brain at the time [of the crime]."

But to leave the analysis at that is to misunderstand the nature of Briones's challenge to a life sentence and the importance of *Montgomery*'s clarification of *Miller*. In *Miller*, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," explaining that a sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 479–80. Left at that, *Miller* could be understood merely as a procedural requirement, mandating that sentencing courts must consider certain hallmark

characteristics of youth and that they must be permitted to impose a sentence less than life. If that were all *Miller* meant, the district court likely would have complied with its dictates.

But the Supreme Court made clear in *Montgomery* that *Miller* stood for more. Beyond procedural boxes to check, *Miller* recognized a substantive limitation on who could receive a life sentence:

> *Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. *Even if* a court considers a child's age before sentencing him or her to a lifetime in prison, *that sentence still violates the Eighth Amendment* for a child whose crime reflects unfortunate yet transient immaturity.

*Montgomery*, 136 S. Ct. at 734 (emphasis added) (internal quotation marks and citation omitted). In light of *Montgomery*, we know that "sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects *irreparable corruption*" and that *Miller* "bar[s] life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect *permanent*

*incorrigibility*." *Id.* (emphasis added) (internal quotation marks omitted).[1]

The heart of Briones's argument before the district court was that he could not be sentenced to life because he is not irreparably corrupt or permanently incorrigible. The "critical question" before the district court, then, was whether Briones had the "capacity to change after he committed the crimes." *United States v. Pete*, 819 F.3d 1121, 1133 (9th Cir. 2016).

B

Unfortunately, we cannot know whether the district court answered that question because there is nothing in the record that allows us to confirm that the court even considered it.

A sentencing court must, "at the time of sentencing, . . . state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). In elaborating on that statutory command, the Supreme Court has explained that "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). "[W]here the defendant or prosecutor presents nonfrivolous reasons for imposing a [non-Guidelines] sentence, . . . the judge will normally . . . explain

---

[1] *Montgomery* was decided only two months before the district court resentenced Briones, and so Briones's arguments were framed in terms of *Miller*. That said, *Montgomery* was raised indirectly by Briones's counsel at sentencing, and Briones's interpretation of *Miller* as a substantive prohibition on life imprisonment for most juvenile offenders is the one that *Montgomery* confirmed to be correct.

why he has rejected those arguments."  *Id.* at 357; *see also United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc) ("A within-Guidelines sentence ordinarily needs little explanation *unless* a party has . . . argued that a different sentence is otherwise warranted." (emphasis added)).

1

Unlike the majority, I am not satisfied that the district court "set forth enough to satisfy the appellate court that he has considered the parties' arguments."  *Rita*, 551 U.S. at 356.  If anything, the record suggests that the district court misunderstood the applicable legal rule of *Miller*.

In explaining its decision to impose a life sentence, the district court indicated that it had "consider[ed] the history of [Briones's] abusive father, [Briones's] youth, immaturity, his adolescent brain at the time, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and that he's been a model inmate up to now."  The court seemingly found those facts—which it considered to be "mitigation"—outweighed by the awfulness of the murder, Briones's role in it, and his leadership in a "violent and cold-blooded" gang.  "Having considered those things," the district court imposed a "sentence of life."

All of those considerations are indeed relevant to selecting a proper sentence based on the sentencing factors of 18 U.S.C. § 3553(a).  But they are not directly responsive to Briones's argument arising out of *Miller* that he is not within the class of the rare juvenile offenders who are permanently incorrigible and hence constitutionally eligible for a life sentence.  The question is not merely whether Briones's crime was heinous, nor whether his difficult upbringing

mitigated his culpability.  It is whether Briones has demonstrated "irreparable corruption," *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479–80), which requires a prospective analysis of whether Briones has the "capacity to change after he committed the crimes," *Pete*, 819 F.3d at 1133.

Nothing in the district court's explanation of its sentence bears directly on the question of whether Briones is irreparably corrupt.  If anything, the sentencing transcript reveals factual findings that suggest Briones has demonstrated a capacity to change.  The district court observed that Briones has "been a model inmate" and that he "has improved himself while he's been in prison."  Perhaps, despite that promising behavior, the district court could have determined that countervailing evidence indicated that Briones is permanently incorrigible.  But the transcript does not indicate that the district court made such determination.

More troubling, the transcript suggests that the district court may have misunderstood the nature of the inquiry Briones was asking it to make.  *Miller* "rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth," which the Supreme Court has instructed includes "the vast majority of juvenile offenders."  *Montgomery*, 136 S. Ct. at 734.  Yet the district court only considered the *Miller* hallmarks of youth as "mitigation," suggesting that it started from the inverted assumption that most juvenile offenders are eligible for life sentences and that Briones's evidence could only mitigate from that.  If the district court fully grappled with *Miller*'s rule, one would think it would have spoken of "aggravating" evidence rather than "mitigation."  Moreover, in explaining that Briones's crime justified a life sentence

because "some decisions have lifelong consequences," the district court suggested it misunderstood *Miller* entirely. The point of *Miller* is that "juveniles have diminished culpability and greater prospects for reform." 567 U.S. at 471. That is why the sentencing analysis must be forward-looking and address the "capacity to change," *Pete*, 819 F.3d at 1133, not the static characteristics of the juvenile defendant at the moment of his criminal decisions. In fact, there are no forward-looking statements at all from the district court in its sentencing colloquy; the stated basis for the sentence was entirely retrospective.

2

To cure the deficiencies in the district court's explanation of the sentence imposed, the government asks us to infer that the district court must have found Briones incorrigible based on a lack of candor when he testified at the resentencing hearing. The majority jumps at this invitation, adopting the government's position to observe that "Briones' statements *could* reasonably be interpreted as not taking responsibility for his prior criminal activity, in contravention of one of the basic tenets of rehabilitation." Majority Op. at 19 (emphasis added).

The equivocal nature of the majority's statement is telling. Perhaps the district court *could* have thought that Briones failed to take responsibility for his actions, but nowhere in the district's court's statement of reasons for the sentence did it say as much. Although the government and the majority offer one plausible interpretation of Briones's testimony, it is hardly the only one. In fact, when I read the transcript, I see much that could support a contrary finding that Briones expressed remorse repeatedly and at length.

Briones expressed regret for his actions.  He admitted the key facts of the murder and subsequent crimes and admitted that "it's probably my fault when I thought about it."  He explained that he regularly asks himself "why didn't I do something at that time, why . . . didn't I stop myself way before that, why didn't I do something at the court?"  He explained that "the thing that haunted me so much about just living in prison was that" the murder victim was "a young Christian man," and that it "haunts me to have that on my hands."  And he said, "I want to express remorse, I want to express grief."

Briones also expressed sympathy for those he had harmed.  For instance, he explained that he did not believe the victim's family could ever forgive him because he was responsible for "a great offense that . . . is unrepaired."  He explained that "now that I'm older . . . I witness not just in my own life people murdered and their killers get to go home," and he can "see[] people in pain when they've gone through their loss, [and] all of this had made me not only sympathize but to empathize with all of it."  He said, "I know I have to apologize for everything and I apologize all the time to my family . . . , and my apology goes out . . . to the [victim's] family."

I do acknowledge that there are portions of the transcript from which one could infer a lack of candor.  It is true that Briones's testimony was not crisp and eloquent.  And it is true that he continued to say that he "didn't think myself a leader" in the gang and that he continued to deny that the plan from the beginning was to murder the Subway clerk.

Perhaps, hearing all the testimony and weighing the countervailing inferences, the district judge could have

concluded that Briones was insufficiently honest or that he failed to take responsibility for his crimes. Perhaps those findings could be evidence of incorrigibility.

But the district court never said any of that. All the reasons that it *did* give for the sentence were about the nature of the crime, not the subsequent lack of remorse or acceptance of responsibility. Reading a cold transcript, the majority is willing to conclude that Briones "never actually took responsibility for any of the crimes of which he was convicted." Majority Op. at 8. I am not willing to reach such a critical factual conclusion based on an ambiguous transcript, especially when the district court made no such factual finding.

The majority accuses me of retrying Briones's case rather than reviewing it as an appellate court should. *See* Majority Op. at 22. But it is the majority that has invented a basis for the sentence which cannot be found in the record. The reason courts of appeals accord great deference to a district court's sentencing decision is that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than . . . the appeals court." *Rita*, 551 U.S. at 357–58. Unlike the majority, I would take advantage of that expertise by remanding for an actual determination of Briones's incorrigibility rather than attempting to divine one by reading a transcript through squinted eyes.

C

Another aspect of this case that gives me pause is that it is not obvious whether or not Briones fits within the class of juvenile offenders constitutionally eligible for a life sentence.

If the only plausible reading of the record were that Briones is incorrigible, I could more easily assure myself that the district court reached that conclusion even though it did not specifically respond to the *Miller* argument. Looking at the record holistically, however, I cannot say that it *necessarily* betrays permanent corruption.

After *Graham v. Florida*, 560 U.S. 48 (2010), the only juvenile offenders eligible for a life sentence are those who committed a homicide. Criminal homicides will invariably be odious crimes, but the Supreme Court nonetheless instructed that only "the rarest of juvenile offenders" may receive a life sentence under the Eighth Amendment. *Montgomery*, 136 S. Ct. at 734. Here, we have a juvenile felony murder offender who helped to plan a robbery-murder, who drove the getaway car, and who then was a leader in a series of subsequent violent crimes. But like one of the defendants in *Miller* itself, Briones "did not fire the bullet that killed" the victim; and like the other defendant in *Miller*, although he was involved in "a vicious murder," Briones had a difficult upbringing replete with substance abuse. 567 U.S. at 478–79. Moreover, in this instance, we have a defendant whom even the district court called a "model inmate," which surely goes to the question of "whether [the defendant] *has* changed in some fundamental way since" the crime. *Pete*, 819 F.3d at 1133. The evidence on incorrigibility is therefore mixed, and we are ill-suited as an appellate court to say that a finding of incorrigibility is the only reasonable one.

## D

As a secondary basis for affirming, the majority leans heavily on the highly deferential plain error standard of review. *See* Majority Op. at 20. In arguing that such review

should apply to this case, the majority analogizes to cases involving defendants making purely procedural arguments on appeal that district courts insufficiently explained otherwise permissible sentences.**[2]**

But here, Briones is not objecting merely to a deficient explanation. Rather, his claim is substantive: that he is constitutionally ineligible for a particular sentence under *Miller*, a claim he *did* squarely argue before the district court, at length. The court's failure properly to explain its sentence requires remand *not* because it was procedural error, but rather because such failure prevents us from being able properly to review Briones's substantive claim. As the majority acknowledges, a district court's sentence is invalid "if the court applied an incorrect legal rule." *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir. 2017) (en banc); *see* Majority Op. at 14. Because the record does not allow us to determine whether the court did apply the correct legal rule, we should remand for that limited purpose.

---

**[2]** Even if Briones were making a purely procedural objection based on the sufficiency of the district court's explanation of how it weighed the 18 U.S.C. § 3553(a) sentencing factors, our case law is not clear regarding what the proper standard of review would be. As the majority contends, in some of those cases, we have reviewed for plain error. *See, e.g.*, *United States v. Kleinman*, 880 F.3d 1020, 1040–41 (9th Cir. 2017); *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010). As happens too often, however, our court has not been consistent. *See, e.g.*, *United States v. Trujillo*, 713 F.3d 1003, 1008–11 & n.3 (not applying plain error review in a case where "[t]he district court did not address" the defendant's sentencing arguments). Because these cases are not relevant to considering Briones's substantive claim, however, we need not resolve this potential intra-circuit split.

II

A

I share the majority's concern that we ought not to conjure procedural sentencing hurdles unsupported by law. I am especially cognizant of this concern because other courts have read *Miller* and *Montgomery* to impose special procedural requirements well beyond what those opinions actually require. *E.g.*, *Commonwealth v. Batts*, 163 A.3d 410, 415–16 (Pa. 2017) ("recogniz[ing] a presumption against the imposition of a sentence of life without parole for a juvenile offender" that may be rebutted only if the government proves, "beyond a reasonable doubt, that the juvenile offender is incapable of rehabilitation").

But the district court's explanation of the sentence may be faulty without requiring that it utter any "magic phrase" to justify its sentence, Majority Op. at 18, and we need impose no special procedures simply because Briones was a juvenile when he committed the murder. Instead, I would simply enforce the requirements of 18 U.S.C. § 3553(c) so that we may properly evaluate Briones's *Miller* claim on appeal.

The error here was not that the district court failed to apply some procedure special to juvenile offenders. Rather, the court failed to provide an adequate explanation of its sentence under the same standard that would apply to any sentencing. It erred because Briones argued that he could not constitutionally be given a life sentence, his arguments were "not frivolous," and the court did not squarely "address any of them, even to dismiss them in shorthand." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013). Remanding for a new sentencing here would have no bearing on a case in

which the defendant does not present a credible argument under *Miller* or one in which the district court explicitly confronted a *Miller* argument about the defendant's incorrigibility.

## B

Comparing this case to another illustrates that we can reasonably expect more of the district court at sentencing without our being overly pedantic. In another case raising a *Miller* claim, submitted to our panel the same day that Briones's case was argued, the defendant-appellant had committed four murders as a juvenile—including two while facing trial—and in the process had disfigured or dismembered and then buried the victims' bodies. *See United States v. Orsinger*, 698 F. App'x 527, 527 (9th Cir. 2017) (unpublished). Two of the victims were a 63-year-old grandmother and her nine-year-old granddaughter, and the defendant had killed the little girl by hand, crushing her head with rocks. We affirmed the life sentence because the district court made clear it had grappled with the *Miller* claim. *See id.*

The fact that another defendant committed even more monstrous crimes than did Briones does not ameliorate the tragedy of an innocent clerk's death or the terror that Briones's gang inflicted on his community. But in that second case with four gruesome murders, and where the defendant had continued to exhibit violence while incarcerated, the sentencing judge nevertheless properly evaluated the objection to a life sentence under *Miller*. That judge "recognize[d] that *Miller* permits life sentences for juvenile offenders only in 'uncommon' cases" and "made a finding that [the defendant] did indeed fit within that

'uncommon' class of juvenile offenders" to justify imposition of a life sentence. *Id.* (quoting *Miller*, 567 U.S. at 479).

That is not to suggest that the district judge in Briones's case could not justifiably impose the same sentence. It only demonstrates that—even in a case that much more obviously compels a conclusion that the defendant is incorrigible—a district judge can properly address a *Miller* claim without invoking any magic phrase. I would require the same of the district court in this case.

### III

Although I concur in Parts I, II.A, and III of the majority opinion, I must respectfully dissent from Part II.B and the ultimate judgment. I would vacate the judgment of the district court and remand for resentencing.