2024 IL App (4th) 230093-U

NO. 4-23-0093

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
February 27, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DeANGELO MARTEZ LINDSEY, | ) | No. 09CF618 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's 30-year prison sentence for first degree murder was affirmed where (1) the trial court acted within its discretion by denying defendant's request for funds for an expert and (2) the sentence was not excessive.

¶ 2    In 2010, a Peoria County jury found defendant, DeAngelo Martez Lindsey, guilty of first degree murder (720 ILCS 5/9-1(a)(3) (West 2008)) in connection with a shooting that occurred when defendant was 17 years old. Defendant originally received a sentence of 52 years in prison. In 2021, defendant filed a postconviction petition, seeking to be resentenced based, in part, on changes in the law regarding sentencing juvenile offenders. The State conceded the need for resentencing. In 2022, the trial court resentenced defendant to 30 years in prison. Defendant appeals, arguing that (1) the court erroneously denied his motion for funds to hire an expert and (2) the sentence is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4               A. Defendant's Conviction and Original Sentence

¶ 5        The 2013 opinion arising from defendant's direct appeal contains a thorough summary of the trial evidence. *People v. Lindsey*, 2013 IL App (3d) 100625, ¶¶ 6-29. For purposes of this appeal, it will suffice to say that on May 27, 2009, Anil Dhingra was fatally shot at a gas station in Peoria during an attempted armed robbery committed by defendant (age 17) and Ali Evans (age 20). The gas station lacked surveillance cameras, and there were no witnesses to the shooting. Thus, the State could not prove definitively whether it was defendant or Evans who fired the gun repeatedly at Dhingra. Nevertheless, some circumstantial evidence suggested that defendant may have been the shooter. Specifically, a witness saw two males run out of the gas station after the shooting, and only one of them had a gun in his hand. Although this witness was unable to identify the person with the gun, she identified Evans as the person who *did not* have the gun. Additionally, the police found the murder weapon at defendant's sister's home, and defendant's fingerprint was on it. Defendant testified in his own defense. Although he acknowledged being at the scene of the shooting, he denied participating in murdering or attempting to rob Dhingra.

¶ 6        At defendant's trial in April 2010, the prosecutor argued that defendant was guilty of first degree murder under an accountability theory, even if he did not personally fire the gun. The jury found defendant guilty. The trial court, Judge James Shadid presiding, sentenced defendant to 52 years in prison. On direct appeal, the appellate court held, *inter alia*, that defendant's sentence was not excessive. *Lindsey*, 2013 IL App (3d) 100625, ¶¶ 53-59.

¶ 7               B. Separate Proceedings Relating to Evans

¶ 8        Evans was tried separately for first degree murder, convicted, and sentenced to 58 years in prison. The appellate court reversed Evans's conviction and remanded for a new trial

based on an evidentiary error. *People v. Evans*, 2012 IL App (3d) 100737-U, ¶ 25. Evans was tried again, convicted, and resentenced to 58 years in prison. The appellate court reversed Evans's conviction and remanded for a third trial based on a different evidentiary error. *People v. Evans*, 2016 IL App (3d) 140120, ¶¶ 24, 59, 62. Evans then pleaded guilty to aggravated battery with a firearm, and he was sentenced to 28 years in prison.

¶ 9    C. Defendant Requests a New Sentencing Hearing

¶ 10    Meanwhile, in 2012, the United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460, 489 (2012), that a mandatory sentence of life in prison without the possibility of parole for a juvenile offender violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). In 2016, the Illinois legislature responded to *Miller* by enacting section 5-4.5-105 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-105 (West 2016)), which contains additional mitigating factors a trial court must consider when sentencing someone for an offense committed as a juvenile. In November 2021, defendant filed a postconviction petition requesting to be resentenced. In May 2022, the State conceded that defendant's 52-year sentence violated the eighth amendment because the trial court had failed to make specific factual findings as required by *People v. Holman*, 2017 IL 120655. (During the pendency of this appeal, our supreme court overruled *Holman* in *People v. Wilson*, 2023 IL 127666, ¶ 42). In June 2022, the trial court granted defendant's postconviction petition and ordered defendant to be resentenced.

¶ 11    D. Defendant's Request for Funds to Hire an Expert for Resentencing

¶ 12    On August 9, 2022, defendant filed a motion requesting funds to hire an expert for the forthcoming resentencing hearing pursuant to section 113-3(d) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/113-3(d) (West 2022)). Defendant argued that "to properly develop all of the information required for the court to consider" under the additional statutory

sentencing factors relating to juvenile offenders (see 730 ILCS 5/5-4.5-105 (West 2022)), "the defense is in need of the services of an expert in psychology to review the defendant's history and circumstances and to prepare a report for the court regarding the same." Defendant indicated that his attorney had consulted with Dr. Oluwatamilore Odimayo, who charged $200 per hour. According to defendant's motion, Dr. Odimayo's rate was equivalent to or significantly less than other experts defense counsel consulted. Defendant requested the trial court to make available approximately $3000 for the defense to retain Dr. Odimayo to evaluate defendant.

¶ 13    Defendant presented this motion to the trial court on August 19, 2022. The prosecutor objected to the motion on that bases that (1) section 113-3(d) of the Code references "capital cases" (725 ILCS 5/113-3(d) (West 2022)), and this is not a capital case and (2) defendant had not shown the need for an expert. Defense counsel responded that although she could make arguments at the sentencing hearing by "applying general principles of adolescent development," she was "certainly not an expert in that." Thus, defense counsel proposed that it was reasonable to have a psychologist evaluate defendant and to "be able to offer an opinion as to those things." With respect to the county paying for an expert, defense counsel contended that $3000 was "a drop in the bucket" because defendant faced a very lengthy prison sentence.

¶ 14    The trial court questioned defense counsel about the need for an expert:

"Okay. Well, what would [the expert] add specifically to your client? Because, I mean, you can get into [defendant's] background, you can get into the factors that apply to youth. We've all read all the studies. What really additionally will [the expert] add? I get it, [defendant] was 17. And I've done a few of these post conviction hearings on this specific issue, including resentencing someone, and I don't—I don't really know what [the expert] will add specifically."

Defense counsel responded:

> "Your Honor, I think it's hard to say until, you know, an evaluation is done, but I think specifically looking at the unique situation of my client's childhood, which may have contributed to his impetuosity, I think specifically knowing what I know about my client it would be, you know, he had a traumatic childhood, which I know can affect, you know, frontal lobe development. So looking at the specifics of his childhood and the home life that he lived at the time, which may have led him to make decisions that he made back in 2009."

The court continued to doubt the need for an expert:

> "All of those things—it has been the Court's experience that every adolescent that acts out in the inappropriate way that your client and the other individuals that find themselves incarcerated for a long time—it has been my experience that all of them have had a home life where none of us would wish that upon our worst enemy.
>
> And so again, I don't—and I understand that most certainly I would consider your individual client in—in assessing the mitigation factors, but I just don't know what specifically would be contributed by this person at the County's expense. So if you would like to present me with any additional information, I will allow that. But at first blush, I don't know what specifically he'll add, other than the general—generalities that all of us already are acquainted with."

The court proposed continuing the matter for a few weeks, giving defense counsel time to submit what she would like before then. The court asked defense counsel whether that would give her enough time. Counsel responded, "That should be fine, Judge."

¶ 15          The trial court addressed this issue again on September 9, 2022. The court asked

defense counsel whether there was anything she would like to add. Defense counsel responded,

"No. No, Your Honor." The prosecutor again objected to the defense hiring an expert at the

county's expense:

> "Well, I guess just to sum up our position, Judge, is that those factors are
>
> already codified and the reasons why are already codified as part of the—I guess
>
> the legislative history behind that act. And so I don't think there would need to be
>
> funds for an expert to come explain those same things to you that are now required
>
> to consider."

The court agreed with the prosecutor and denied defendant's request for funds.

¶ 16                    E. Materials Submitted for the Resentencing Hearing

¶ 17          The materials submitted for resentencing showed the following.

¶ 18          Defendant was born in December 1991, and he had no spouse or children. He

completed the eighth grade. He had not yet obtained a general equivalency diploma (GED), though

he intended to do so.

¶ 19          In May 2008, defendant was sentenced to 2 years of probation and 30 days of

juvenile detention for residential burglary. Defendant violated the terms of his probation by failing

to report, using marijuana, failing to be assessed for drug and alcohol treatment, and committing

ordinance violations. Defendant later violated the conditions of probation again by failing to report,

failing to notify of a change in address, and being unsuccessfully discharged from intensive

outpatient treatment (evidently for substance abuse). On May 8, 2009, a warrant was issued for

defendant's detention in connection with the residential burglary case. On May 31, 2009,

defendant was served with that warrant when he was arrested for murder in connection with

Dhingra's May 27, 2009, shooting. Defendant had remained incarcerated since that time. In 2011, defendant was disciplined in prison for fighting with another inmate.

¶ 20  In 2013, defendant was convicted of direct criminal contempt and was sentenced to 10 years in prison for failing to testify against Evans. However, defense counsel told the trial court at defendant's resentencing hearing that this conviction had been vacated at some point.

¶ 21  Defendant's mother, who was a minister in Georgia, completed a family questionnaire as part of the presentence investigation for defendant's resentencing. She indicated she and defendant's father were never married, and she raised defendant without any help. Defendant's mother represented that she parented defendant appropriately and successfully during his younger years. For example, she answered that defendant was "not at all" a disciplinary problem as a child or a teen, earned average grades, and never had any problems in school.

¶ 22  According to defendant's mother, defendant encountered different circumstances when he was 15 years old and moved to live with his father, who had 22 children. Defendant's mother lamented that it was the "biggest mistake of [her] life" to allow defendant to live with his father. She did not specify the details of defendant's time with his father. However, she was told that defendant "was out to his own care" during that time.

¶ 23  Apparently referencing the fact that defendant was incarcerated at age 17, defendant's mother asserted in the questionnaire that defendant did not have the opportunity to participate in extracurricular activities or to graduate from high school. (In another questionnaire that is in the record, defendant's mother responded that defendant participated in the Boys and Girls Club.) She believed that defendant was "normal" when he was first incarcerated, but he would need counseling after being "scared and mentally abused in the prison system." Defendant's mother still had a "very open and supportive" relationship with defendant, "to the best of [her]

ability." She described defendant as a "very caring[,] compassionate person," who was neither violent nor aggressive.

¶ 24        Defendant's 2010 presentence investigation report in connection with the original sentencing hearing for murder was also submitted for the trial court's consideration. This report included additional information that shed light on defendant's childhood. Throughout his childhood, defendant "moved back and forth from his mother's residence in Atlanta, Georgia to his fathers [*sic*] in Peoria." Defendant's father had "an extensive criminal record in Peoria County." Defendant never attended a " 'regular' " high school, as "his father would not take the time to enroll him." Defendant had been living with his father in Peoria prior to being incarcerated for murder. In 2008, defendant attended an adult education program, but he was soon dropped for "insubordination." Defendant reported having a "very close relationship with his mother." Although defendant loved his father, defendant reported that his father " 'was never there' " for him. When defendant had lived with his mother, he attended church, participated in activities, did chores around the house, and abided by a curfew. When defendant lived with his father, "he was not required to do chores and he was not punished for misbehavior and no curfew was set." Defendant reported a history of using cannabis, but he denied using other drugs or alcohol.

¶ 25        The record includes multiple evaluations that defendant underwent during his incarceration. These reports indicate no notable mental health issues.

¶ 26                         F. Defendant's Resentencing Hearing

¶ 27        On December 8, 2022, the matter proceeded to a resentencing hearing. The sentencing range was 20 to 60 years in prison, and the trial court had the discretion to impose an additional 15-year firearm enhancement. However, the parties agreed the court could not impose a sentence exceeding defendant's original sentence of 52 years in prison. The State presented no

evidence in aggravation. Defendant presented testimony from Wendell Robinson, who described his own work for an organization that helps people reacclimate to society after serving lengthy prison sentences.

¶ 28 The trial court denied defendant's request to introduce into evidence an "adverse childhood experience questionnaire" that defendant completed. At defendant's request, the court admitted documentary evidence indicating that Evans was projected to be released from prison in March 2033 pursuant to a negotiated plea deal. The prosecutor asked the court to sentence defendant to 52 years in prison. Defense counsel requested 20 years in prison.

¶ 29 In his statement in allocution, defendant apologized to Dhingra's family. Defendant indicated he was "trying to get a second chance at life." He believed that during his incarceration, he had "become a rational person when it comes to being a cognitive thinker." Defendant said that if he were given "a second chance and an opportunity to get out sooner rather than later," he could prove his rehabilitation.

¶ 30 The trial court began its ruling by saying it considered (1) the presentence investigation report, (2) the entire court file, (3) the evidence and arguments, (4) defendant's statement of allocution, (5) the statutory sentencing factors, including those relating specifically to juvenile offenders, (6) defendant's history and character, and (7) the nature and circumstances of the offense.

¶ 31 The trial court then said the following about defendant's childhood and upbringing:

"I'm just going to visit with you here for a few minutes and tell you that as a human being it just really makes me sad when I see people like you who didn't have anybody to lean on when you were growing up. And that's not your fault. It's

- 9 -

not. And is it any surprise that when you're a kid, you're going to act out in a way that's detrimental to you if nobody cares?

And maybe I'm being too hard on your parents, but just based upon what I've read, they may have cared, but were pretty neglectful in my opinion of the needs of you as a child and seen to it [*sic*] that you would have the opportunities available to you by just looking after you and being sure that you were taken care of and you had the opportunity to go to school and be with your peers and feel like you had a safe, secure place to go home to.

And I want to make it clear to you that I recognize that that's not your fault. Period. And I'm sorry that that happened to you.

And having done this quite sometime [*sic*], it really makes me sad to see young people sitting here in this position that really do bad things. And I wish it would stop. I just wish that people would stop shooting each other and taking things that don't belong to them because you feel like it."

¶ 32 The trial court then said that what defendant did was "really horrible," and the court had "to consider that a life was taken." The court also considered that "it was planned." Based on what the court had heard, although defendant was "not the person" (*i.e.*, he did not personally shoot Dhingra), defendant was "along" and "should have known better." The court understood that defendant was "approximately 17 years and 166 days old" at the time of the offense, and the court was "most certainly considering a young man of that age and behaving in that manner."

¶ 33 The trial court also said it considered that because defendant "stopped going to school in the eighth grade," "the structure that school provides to young people was not in place"

- 10 -

for him. The court stated that defendant had "behaved" while incarcerated. The court expressed that it was "[g]ood" that defendant still intended to obtain his GED.

¶ 34 The trial court also mentioned that defendant had a juvenile record and that "a gun was used in the offense." The court explained it was "doing damage" for young people to use guns in this community and across the country. The court added, "we can't have young people running around with guns" and shooting people.

¶ 35 After "considering all these things that I have just referenced," along with its discretion whether to impose a 15-year firearm enhancement, the trial court sentenced defendant "to a total of 30 years" in prison. The court told defendant, "[I]t is my fondest hope that when you get out that you take advantage of the resources that are available and make better decisions for you."

¶ 36 G. Motion to Reconsider Sentence and Notice of Appeal

¶ 37 Defendant moved to reconsider his sentence. In relevant portion, he argued that the trial court erroneously denied his request for funds to hire an expert. He also argued that it was fundamentally unfair for him to serve a 30-year sentence at 100% when Evans was serving a 28-year sentence at 85%. Defendant contended that his sentence was excessive and not in line with the objective of restoring him to useful citizenship.

¶ 38 The trial court denied defendant's motion to reconsider the sentence.

¶ 39 This timely appeal followed.

¶ 40 II. ANALYSIS

¶ 41 A. Request for Funds for an Expert

¶ 42 Defendant first argues that the trial court erred by denying his request for funds for an expert. According to defendant, he was entitled to funds for an expert because (1) he was

indigent and (2) an expert "was indispensable in proving the central issue at sentencing," defendant's rehabilitative potential. Defendant maintains that his "rehabilitative capacity was critical to determining whether, under *Miller* and its progeny, he could be resentenced to life in prison without the possibility of parole." As persuasive authority, defendant relies heavily on *United States v. Pete*, 819 F.3d 1121 (9th Cir. 2016). Defendant requests for us to "vacate his sentence and remand the matter for a new sentencing hearing, including the appointment of an expert."

¶ 43    The State responds that defendant inappropriately relies on eighth amendment caselaw tracing its origins to *Miller*. According to the State, because defendant faced a discretionary sentencing scheme where the minimum available sentence was 20 years in prison, and because the trial court did not refuse to consider defendant's youth, "defendant's sentencing complied with *Miller* and the Eighth Amendment." The State acknowledges that the nonapplicability of *Miller* does "not entirely resolve defendant's claim," as he also argues an expert was necessary to weigh the statutory mitigating factors. The State proposes that the court correctly denied defendant's request for funds for an expert, as the materials available to the court for the resentencing hearing contained "sufficient information about defendant's youth and attendant circumstances, as well as defendant's rehabilitative potential." The State further submits that any error was harmless, as defendant was not prejudiced by the denial of access to an expert.

¶ 44    Section 113-3(d) of the Code provides:

> "In capital cases, in addition to counsel, if the court determines that the defendant is indigent the court may, upon the filing with the court of a verified statement of services rendered, order the county Treasurer of the county of trial to pay necessary

expert witnesses for defendant reasonable compensation stated in the order not to exceed $250 for each defendant." 725 ILCS 5/113-3(d) (West 2022).

Despite the language limiting this statute to capital cases, our supreme court has explained that "in certain instances," the policy underlying this statute "should be extended to noncapital felonies." *People v. Watson*, 36 Ill. 2d 228, 234 (1966). Additionally, the $250 statutory limit is not a strict limit where reasonable fees exceed that amount. *People v. Evans*, 271 Ill. App. 3d 495, 500-01 (1995).

¶ 45    Aside from this statute, circumstances may arise where the United States Constitution requires the State to facilitate an indigent defendant's access to an expert. See *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985) ( "[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one."). The Illinois Constitution provides a similar right, "when the expertise sought goes 'to the "heart of the defense." ' " *People v. Keene*, 169 Ill. 2d 1, 7 (1995) (quoting *People v. Lawson*, 163 Ill. 2d 187, 221 (1994), quoting *Watson*, 36 Ill. 2d at 234).

¶ 46    Whether considered as a constitutional challenge or as a request pursuant to statute, "a standard has evolved that there must be some showing that the requested expert assistance is necessary in proving a crucial issue in the case and that the lack of funds for the expert will therefore prejudice defendant." *Lawson*, 163 Ill. 2d at 221. What is *crucial* differs from what is merely "useful, helpful, valuable, or even important to the defense effort." *Keene*, 169 Ill. 2d at 7. "[W]hether the expertise sought is of that nature will vary with the circumstances of each case." *Keene*, 169 Ill. 2d at 7. "What is crucial to the defense effort is often made plain in taking account of the inculpatory evidence offered." *Keene*, 169 Ill. 2d at 8. We review for an abuse of discretion

the trial court's decision to deny a defense motion seeking funds for an expert. *Lawson*, 163 Ill. 2d at 230. Under the abuse-of-discretion standard of review, we may reverse the judgment only if the challenged decision is " 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. Bush*, 2023 IL 128747, ¶ 57 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37).

¶ 47　　　　As an initial matter, we note that throughout his brief, defendant cites eighth amendment caselaw tracing its origins to *Miller*. To be clear, the holding of *Miller* is not directly applicable to this appeal, as defendant does not argue that his 30-year prison sentence violates the eighth amendment. Additionally, defendant cites *Holman*, even though our supreme court overruled that case before defendant filed his brief. See *Wilson*, 2023 IL 127666, ¶ 42.

¶ 48　　　　Although defendant does not raise an eighth amendment challenge, section 5-4.5-105(a)(1)-(9) of the Unified Code contains the following mitigating factors derived from *Miller* that a trial court must consider when sentencing someone for an offense committed as a juvenile:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2022).

¶ 49 Defendant filed a motion seeking approximately $3000 of public funds to retain Dr. Odimayo. Defendant submitted that "to properly develop all of the information required for the court to consider" under the statutory sentencing factors relating to juvenile offenders, "the defense is in need of the services of an expert in psychology to review the defendant's history and circumstances and to prepare a report for the court regarding the same."

¶ 50 When defendant first presented this motion, the trial court questioned defense counsel about the need for an expert, given that (1) counsel could address the relevant factors at the sentencing hearing, (2) "[w]e've all read all the studies" about juvenile offenders, and (3) the court had experience sentencing juvenile offenders. Defense counsel responded:

"Your Honor, I think it's hard to say until, you know, an evaluation is done, but I think specifically looking at the unique situation of my client's childhood, which may have contributed to his impetuosity, I think specifically knowing what

- 15 -

I know about my client it would be, you know, he had a traumatic childhood, which I know can affect, you know, frontal lobe development. So looking at the specifics of his childhood and the home life that he lived at the time, which may have led him to make decisions that he made back in 2009."

The court continued to doubt the need for an expert at the public's expense, given that the court's experience had shown that offenders facing long prison sentences universally had terrible home lives. The court offered defense counsel the opportunity to present additional information, beyond "generalities," at the next court date.

¶ 51　　　　When the matter returned to court, defense counsel declined the opportunity to add anything further in support of defendant's motion. The prosecutor argued:

"Well, I guess just to sum up our position, Judge, is that those factors are already codified and the reasons why are already codified as part of the—I guess the legislative history behind that act. And so I don't think there would need to be funds for an expert to come explain those same things to you that are now required to consider."

The trial court agreed with the prosecutor and denied defendant's request for funds.

¶ 52　　　　Under the circumstances, we hold that the trial court did not abuse its discretion. Again, "there must be some showing that the requested expert assistance is necessary in proving a crucial issue in the case and that the lack of funds for the expert will therefore prejudice defendant." *Lawson*, 163 Ill. 2d at 221. Here, the court indicated its familiarity with the caselaw, statutory factors, and studies pertaining to juvenile offenders. The court also gave defense counsel ample opportunity to identify a concrete reason why an expert was necessary for defendant's resentencing hearing, and counsel arguably failed to do so.

¶ 53    The facts here are distinguishable from the cases defendant cites, where reviewing courts determined that the defense required the assistance of an expert. In both *Ake* and *Lawson*, the government relied on expert testimony, and the defense sought the assistance of an expert to counter that evidence. See *Ake*, 470 U.S. at 73 (noting that at the defendant's capital sentencing hearing, the State relied on the opinions of its own psychiatrists, who had testified during the guilt phase of the proceedings that the defendant was dangerous to society); *Lawson*, 163 Ill. 2d at 229-30 (reasoning that the State possessed an unfair advantage where the trial court denied the defense funds for an expert to counter the State's expert, who offered the "strongest evidence" of the defendant's guilt). Unlike in *Ake* and *Lawson*, defendant did not request an expert to counter the State's expert evidence. Defendant also cites *Watson*, where our supreme court determined it was error to deny funds to hire a handwriting expert who potentially could have demonstrated the defendant's innocence of a forgery charge. *Watson*, 36 Ill. 2d at 234. *Watson* is distinguishable, as the present case does not involve expert testimony that could be dispositive of defendant's innocence. Defendant further cites *Evans*, where the defendant sought to present a defense (battered woman syndrome) that could only be established through expert testimony. *Evans*, 271 Ill. App. 3d at 502. That is distinguishable from the present case, where the defense could argue the relevant sentencing factors without the assistance of an expert.

¶ 54    Defendant relies most heavily on *Pete*. In *Pete*, the defendant was 16 years old in May 2002, when he sexually assaulted and murdered a woman. *Pete*, 819 F.3d at 1124. In May 2003, a forensic evaluator interviewed the defendant in connection with the government's petition to transfer the case to adult court. *Pete*, 819 F.3d at 1125. The district court granted the government's transfer petition. *Pete*, 819 F.3d at 1126. The defendant was found guilty in 2005, and the district court sentenced him to life in prison without parole. *Pete*, 819 F.3d at 1126.

¶ 55     In 2013, the district court granted the defendant's motion for resentencing in light of *Miller*. *Pete*, 819 F.3d at 1126. In advance of the resentencing hearing, pursuant to a federal statute, the defendant requested funds to retain Dr. Marc Walter to assist him in pursuing mitigating evidence. *Pete*, 819 F.3d at 1126. Given the passage of more than a decade since he had last been evaluated, the defendant proposed that,

> "Dr. Walter would conduct a comprehensive neuropsychological evaluation which would let us know [the defendant's] 'mental age,' whether he has any cognitive dysfunction which could make him more suggestible or impair his judgment, and whether he has any particular mental disorders which could have played into his behavior." *Pete*, 819 F.3d at 1126.

The defendant also contended that Dr. Walter could offer insight about the impact that incarceration had on the defendant. *Pete*, 819 F.3d at 1126. The district court denied the defendant's motion, reasoning that (1) it was " 'difficult to conceive how' " the passage of time would have affected the mitigating evidence already contained in the 2003 evaluation, (2) a second evaluation would be duplicative of the first, and (3) the impact of incarceration was not mitigating evidence. *Pete*, 819 F.3d at 1127. The district court sentenced defendant to 59 years in prison. *Pete*, 819 F.3d at 1130.

¶ 56     The Ninth Circuit concluded that the district court abused its discretion by denying the defendant's request for funds for an expert. *Pete*, 819 F.3d at 1130. In determining that the defendant had demonstrated that an expert was necessary, the court explained that the district court erroneously discounted the relevance of updated information showing how the defendant had changed since being incarcerated. *Pete*, 819 F.3d at 1130-33. With respect to the impact of the defendant's incarceration, the court further reasoned that a defense expert was necessary to rebut

the State's evidence that the defendant had behaved poorly in prison. *Pete*, 819 F.3d at 1133. Moreover, according to the court, the defendant showed he was prejudiced by the denial of an expert, because he " 'requested expert services in furtherance of a claim that would, if meritorious, change the outcome of the case.' " (Emphasis omitted.) *Pete*, 819 F.3d at 1134 (quoting *United States v. Rodriguez-Lara*, 421 F.3d 932, 947 (9th Cir. 2005)). On that point, the court reasoned that the proposed expert could have (1) updated the court about the defendant's mental status, (2) placed the defendant's prison record in context, and (3) potentially supported the defendant's position about his rehabilitative potential and the positive changes he had made since being incarcerated. *Pete*, 819 F.3d at 1134. Because the district court was "skeptical, at best," of the defendant's arguments at the resentencing hearing, an expert evaluation "was likely the only *Miller*-related evidence that could possibly convince the district court that [the defendant] deserved leniency." *Pete*, 819 F.3d at 1134.

¶ 57      *Pete* is distinguishable from our case and does not compel a conclusion that the trial court erred by denying defendant funds for an expert. In *Pete*, the district court's analysis regarding the need for an expert was skewed by an erroneous belief that the defendant's personal growth and maturation over more than a decade in prison were irrelevant at resentencing. Here, the court operated under no similar mistake of law. Moreover, unlike in *Pete*, the State here did not rely on defendant's bad conduct while incarcerated as a basis for imposing a harsh sentence, so defendant did not need an expert to counter such evidence and put the infractions into perspective. Additionally, the prejudice to the defense of denying funds for an expert was more obvious in *Pete*, as the district court ultimately rejected the defendant's claims at the sentencing hearing and sentenced him to 59 years in prison. Here, by contrast, the court expressly took account of defendant's youth at the time of the offense and his difficult upbringing. The court also sentenced

defendant to 30 years in prison, which was 10 years more than the minimum sentence and far from the maximum. Thus, unlike in *Pete*, this was not a situation where an expert would have been defendant's only chance to convince the court that he "deserved leniency." *Pete*, 819 F.3d at 1134. Furthermore, before denying defendant's request for funds for an expert, the court here gave defense counsel the opportunity to present additional information regarding the request, and counsel declined that opportunity.

¶ 58　　　　Having determined that *Pete* is distinguishable and the trial court did not abuse its discretion, we need not consider *People v. Arrieta*, 2021 IL App (2d) 180037-U, ¶¶ 101-05, an unpublished case the State cites in which the court deemed *Pete* unpersuasive in the context of a plain error analysis.

¶ 59　　　　　　　　　　　B. Excessive-Sentence Claim

¶ 60　　　　Defendant also argues that the trial court abused its discretion by inadequately assessing his youth and its attendant circumstances, rendering his sentence excessive. Defendant insists he preserved this issue by raising it in a postsentencing motion, even though he did not raise a contemporaneous objection. Alternatively, defendant invokes the plain error doctrine. The State responds that defendant forfeited this argument and failed to demonstrate plain error. As we will explain, defendant has not shown any error, much less a "clear or obvious" one, as would be required under the plain error doctrine. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 61　　　　The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. " 'In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed.' " *People*

*v. Lawson*, 2018 IL App (4th) 170105, ¶ 33 (quoting *People v. Hestand*, 362 Ill. App. 3d 272, 281 (2005)). The Unified Code specifies numerous "mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence." *People v. Klein*, 2022 IL App (4th) 200599, ¶ 35. Those factors are set forth in sections 5-5-3.1 and 5-5-3.2 (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2022)). Section 5-4.5-105(a) (730 ILCS 5/5-4.5-105(a) (West 2022)) contains additional factors that supplement, but do not replace, the normal sentencing provisions when the offender was under 18 years of age at the time of the offense. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31.

¶ 62 Not all statutory mitigating factors apply in every case. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. "Moreover, the trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender, and that omission does not mean the trial court did not consider all relevant factors." *Merriweather*, 2022 IL App (4th) 210498, ¶ 31; see also *People v. Marks*, 2023 IL App (3d) 200445, ¶ 61 (recognizing that failure to mention a sentencing factor listed in section 5-4.5-105(a) "does not mean [the trial court] did not consider [the factor] as important or relevant"). "Absent explicit evidence to the contrary, we also presume the court considered all mitigating factors." *People v. Page*, 2022 IL App (4th) 210374, ¶ 52.

¶ 63 The trial court has discretion to weigh the appropriate factors, and "[t]he appellate court may not substitute its judgment for that of the trial court merely because it might have weighed those factors differently." *Klein*, 2022 IL App (4th) 200599, ¶ 37. Additionally, "a reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper." *Klein*, 2022 IL App (4th) 200599, ¶ 37. We may reverse a sentence within the statutory range only if the trial court abused its discretion, which means that the sentence is

"greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Klein*, 2022 IL App (4th) 200599, ¶ 38.

¶ 64 When defendant was originally sentenced in 2010, his sentencing range was 35 to 75 years in prison (20 to 60 years in prison for first degree murder, plus a 15-year firearm enhancement). *Lindsey*, 2013 IL App (3d) 100625, ¶ 57. At the resentencing hearing, defendant had the benefit of section 5-4.5-105(b) of the Unified Code (730 ILCS 5/5-4.5-105(b) (West 2022)), which authorized the trial court to decline to impose a firearm enhancement because defendant was under 18 years old at the time of the offense. The court resentenced defendant to 30 years in prison, which indicates the court exercised its discretion not to impose a firearm enhancement.

¶ 65 The crime in this case was senseless, shooting repeatedly and killing an unarmed gas station clerk during an attempted robbery. There was some evidence suggesting that defendant might have been the shooter, but even if Evans was the shooter, defendant was legally accountable for the murder.

¶ 66 Moreover, defendant had a history of criminality. As a juvenile, he was sentenced to 2 years of probation and 30 days of detention for residential burglary. Defendant violated the terms of his probation, and there was a warrant for his arrest when he committed the murder at the gas station.

¶ 67 However, defendant was only 17 years old at the time of the murder, and he had a difficult upbringing. Defendant apparently had a strong support system when he lived with his mother in Georgia, but he faced much different circumstances in the two years before the murder, when he went to live with his father. Defendant's father clearly did not provide defendant with the support, guidance, and stability that every child deserves.

¶ 68    The record shows that the trial court accounted for the totality of the circumstances when concluding that a 30-year prison sentence was warranted. We recited the court's comments at length above, and we need not do so again. It will suffice to say that the court expressly said it considered everything it should have, including the statutory sentencing factors relating to juvenile offenders. In its ruling, the court also specifically addressed defendant's youth, upbringing, criminal history, and the nature of the offense. We cannot say that a 30-year prison sentence is either "greatly at odds with the spirit and purpose of the law" or "manifestly disproportionate to the nature of the offense." *Klein*, 2022 IL App (4th) 200599, ¶ 38.

¶ 69    In arguing to the contrary, defendant proposes that the trial court (1) "did not adequately consider" the relevant factors, (2) misapprehended "how to consider the effects of youth and its attendant characteristics," (3) "either disregarded factors, rendered them insignificant, or, at its worst, used them as aggravating factors," and (4) "made no note" of some factors. Defendant scrutinizes the court's comments and explains why he believes the court should have weighed the mitigating factors differently. As part of this argument, defendant mentions that Evans ultimately received a more lenient sentence than he did by pleading guilty to a lesser offense. Defendant further contends that *People v. McKinley*, 2020 IL App (1st) 191907, "offers valuable guidance in illustrating the court's error."

¶ 70    Defendant has not demonstrated an abuse of discretion. The trial court expressly stated it considered the relevant statutory factors, and a court is under no obligation to articulate its reasoning with respect to each factor. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. At heart, defendant's argument is a misguided plea for us to reweigh the applicable factors. The question for our consideration is whether the court abused its discretion, "not whether this court or any other court *might* have weighed the mitigating and aggravating factors differently." (Emphasis in

- 23 -

original.) *Klein*, 2022 IL App (4th) 200599, ¶ 42. The fact that Evans received a different sentence by pleading guilty to a lesser offense does not change our analysis. "[A] sentence imposed pursuant to a plea of guilty does not provide a valid basis of comparison to a sentence imposed subsequent to trial and conviction." *People v. Moss*, 205 Ill. 2d 139, 171 (2001).

¶ 71    Defendant relies on *McKinley*, a case in which the First District exercised its power to reduce a 39-year prison sentence for a 16-year-old homicide offender. That case involved unusual circumstances that are not present here, including that (1) the defendant presented "overwhelming" evidence of his rehabilitation during incarceration, (2) the trial court made comments at sentencing suggesting "a predisposition to punish certain types of offenders more harshly," and (3) the trial court improperly determined that a mitigating factor (the effect of peer pressure) was an aggravating factor. *McKinley*, 2020 IL App (1st) 191907, ¶¶ 73, 80, 88. *McKinley* does not support defendant's argument that the court here abused its discretion.

¶ 72                                    III. CONCLUSION

¶ 73    For the reasons stated, we affirm the trial court's judgment.

¶ 74    Affirmed.